BIOFEEDTRAC, INC., Plaintiff,

v.

KOLINOR OPTICAL ENTERPRISES & CONSULTANTS, S.R.L.; George Jordan; Alessandro Fossetti; Marco Vespa; Worldwide Regulation Services, Ltd.; Worldwide Regulation Services, Inc.; WRS Manufacture, Inc.; WRS Vision, Inc.; Patrick G. McGarry; Wendy McGarry; Richard C. Lanzillotto; Christopher Kuehn; Chimitec S.A.S.; Filippo Pratesi; Essinar, Ltd.; Reagan Dees; Dov Gottesman; Noam Gottesman; Biotec Vision, S.A.; Ramon Codina; and Maria Codina, Defendants.

No. 90 C 1169.

United States District Court,
E.D. New York.

March 24, 1993.

Manning, Raab, Dealy & Sturm, New York City (William J. Dealy, of counsel), for plaintiff.

Chadbourne & Parke, New York City (Jerome C. Katz, of counsel), for defendants Dov Gottesman and Noam Gottesman.

Christopher K. Kuehn, pro se.

Raymond Codina, Maria Codina, pro se.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

Plaintiff, a New York corporation with offices in Brooklyn, New York, brought this action against defendant Kolinor Optical Enterprises & Consultants, S.R.L. (Kolinor), its licensee, for breach of a licensing agreement for a vision device, tortious interference with contractual relations, unfair competition, trademark infringement, and false designation of origin. Kolinor is an Italian company with headquarters in Florence, Italy, and the original complaint was based on diversity jurisdiction.

On May 3, 1990 the court enjoined Kolinor and anyone acting in concert with it from, among other things, developing a vision training device in competition with plaintiff's trainer in violation of confidentiality and non-competition clauses in a distribution agreement between Kolinor and plaintiff.

Thereafter, plaintiff allegedly discovered a conspiracy among Kolinor and others to steal plaintiff's technical secrets in order to manufacture and market a competing vision trainer named the Enlightener. It filed with leave of the court an amended complaint adding numerous (including several non-diverse) defendants and claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, and under common law for misappropriation of confidential know-how and trade secrets.

By Memorandum and Order dated June 26, 1991, familiarity with which is assumed, the court dismissed the RICO counts as to all defendants, with leave to replead. The court held that the amended complaint did not allege adequately an "enterprise."

On October 28, 1991 plaintiff filed a Second Amended Complaint (the Complaint) which now names 20 defendants in addition to Kolinor and which alleges the following facts about each of them.

Defendant George Jordan, a resident of Florence, Italy is the president of Kolinor.

Defendants Allessandro Fossetti and Marco Vespa, both residents of Italy, are principals and officers of Kolinor.

Defendant Christopher K. Kuehn, a New York lawyer, provided legal counsel to Kolinor initially while an associate at Cutner & Rathkopf and, later, as a private practitioner. He subsequently also provided legal counsel to defendants WRS Manufacture, Inc. and WRS Vision, Inc.

Defendant Filippo Pratesi is the president of defendant Chimitec S.A.S. and is believed to reside in Florence, Italy. He and Fossetti disassembled a Biofeedtrac vision trainer and developed the prototype of a competing trainer, known as the "Enlightener."

Defendant Reagan Dees, a resident of London, England, is the chairman of defendant, Essinar, Ltd. (Essinar), a foreign corporation with offices in London, England. Kolinor had an agreement with Essinar, granting it the exclusive right to distribute the Biofeedtrac trainer in the United Kingdom.

Defendants Ramon Codina (Codina) and Maria Codina, reside in Barcelona, Spain. They are, respectively, the president and an officer of Biotec, S.A. (Biotec), which, like Essinar, had an exclusive agreement with Kolinor to distribute the Biofeedtrac trainer in Spain and Portugal.

Defendant Worldwide Regulation Services, Ltd. (Worldwide), a foreign corporation formed in the United Kingdom, is in the business of assisting manufacturers of electrical and medical equipment in meeting equipment standards so that the equipment may be imported into various countries. Worldwide maintains offices in Tucson, Arizona, and at the time of the actions alleged in the Complaint, it maintained offices in Bohemia, New York.

Defendants WRS Manufacture, Inc. and WRS Vision, Inc., Delaware corporations with offices in Tucson, Arizona, were established, respectively, to manufacture and market the Enlightener vision trainer.

Defendant Worldwide Regulation Services, Inc. is a New York corporation which, at certain relevant times, had offices in New York.

Defendant Patrick G. McGarry is the managing director of Worldwide and the president of the other Worldwide and WRS companies. At the time of the actions alleged in the Complaint he apparently resided in New York State and in England. Defendant Wendy McGarry is or is believed to be an officer, director or shareholder of these companies.

Defendant Richard C. Lanzillotto, a New York resident, is an officer of Worldwide and Worldwide Regulation Services, Inc.

Defendant Dov Gottesman (Gottesman) resides in Geneva, Switzerland and intended to or did invest in the scheme to manufacture and market the Enlightener. His son, defendant Noam Gottesman, resides in London, England.

The court addresses three motions. Gottesman and Noam Gottesman move to dismiss the Complaint for lack of personal jurisdiction. Kuehn moves to dismiss claims alleging violations of the RICO Act and tortious interference with contractual relations.

And plaintiff seeks an order that Codina and Maria Codina have defaulted together with injunctive relief.

I

The parties have conducted substantial discovery since 1990 and have submitted affidavits, deposition testimony, and documentary evidence in support of the various motions. The papers show the following.

A. *The Biofeedtrac–Kolinor–Essinar–Biotec distribution network*

Plaintiff manufactures and holds patents in the United States and the United Kingdom for a vision training device which, using the principles of biofeedback, allows a patient to learn how to control a muscle in the eye and, thus, improve visual focusing ability. The vision trainer is reportedly effective in reducing myopia and in improving other vision impairments. Dr. Joseph N. Trachtman is both the inventor of the Biofeedtrac trainer and the president of the company.

On November 6, 1987 Dr. Trachtman and Jordan executed a distribution agreement whereby Kolinor would have the exclusive right, until December 31, 1989, to distribute the Biofeedtrac trainer in the European Economic Community, Israel, and North Africa.

In 1988 Kolinor entered into sub-distribution agreements with Essinar and Biotec, granting them exclusive rights to distribute Biofeedtrac trainers, respectively, in the United Kingdom and in Spain and Portugal.

Beginning in 1988 Dr. Trachtman, Jordan, and Gottesman, an investor, began to negotiate a deal whereby Jordan and Gottesman would acquire the worldwide distribution rights to the Biofeedtrac trainer. These negotiations broke down in January 1989 when Dr. Trachtman insisted that Gottesman pay $6 million up front to proceed with the venture.

B. *The Jordan–Kuehn–McGarry–Gottesman scheme*

By mid–1989 business relations between Dr. Trachtman and Jordan apparently began to deteriorate. Dr. Trachtman was evidently uncertain that he would renew the agreement with Kolinor that would expire at the end of the year.

Jordan, too, had doubts that Kolinor would continue to purchase vision trainers from plaintiff after the distribution agreement expired. On July 18, 1989 Kuehn wrote a letter at Jordan's request to Gottesman. In it he explained that Kolinor needed to find a new supplier for vision trainers because plaintiff was "incapable of supplying functioning units" or providing after-sales warranty service. He also indicated that he would ask an acquaintance, McGarry, for assistance in an effort to replace the Biofeedtrac trainers.

By December 3, 1989 the Jordan–Kuehn–Gottesman plan had taken a more definite form. On that date Kuehn sent a facsimile transmission to Jordan explaining that Kolinor would stretch out negotiations with plaintiff on a new distribution contract. The transmission said:

5. Ultimately, a new contract is not in Kolinor's interest, since any such contract will, by definition, contain non-competition and confidentiality clauses....

6. The vision training device which is being developed will use some of the technology and method which was used in the Biofeedtrac AVT. At this time, it is not clear whether this technology and method is the property (through patents) of Biofeedtrac or simply the application of other, previously known technology....

11. The reaction of the Trachtmans upon learning of the new vision training device can only be guessed at and the procedure and outcome of any litigation they might commence can only be the subject of speculation....

a. In order to evaluate their options, the Trachtmans would first have to purchase one of the new vision training devices which will not be easy to do, since this is a very controlled market....

d. The Trachtmans could also attempt to invalidate international or European patents protecting the new vision training device.... In order to evaluate the chances of such proceedings, the final

development of the vision training device must be awaited.

Gottesman admits that he received this transmission (indeed, it was produced in discovery by Gottesman and not by the less-forthcoming Kuehn), but says that he does not remember reading it. He adds that at the time he received the communication, "the subject of vision trainers had stopped being of interest to me."

By February 1990 Gottesman's flickering interest in vision trainers was rekindled. He says he met with Jordan and McGarry in Florence and, in the following several months, with McGarry two or three times in London.

On February 22, 1990 McGarry sent Gottesman his notes from a meeting with Kuehn the previous day which outlined in some detail the structure of the proposed business enterprise to manufacture and market the Enlightener vision trainer. Gottesman would be the main contributor, providing $250,000. Jordan "will contribute the design of the new vision trainer." Gottesman and Jordan would hold 50% of the shares (with the division between the two to be determined at a later time), and they would individually have the power under a shareholders agreement to appoint one director. The plan also outlined other capital contributions, a proposed appointment of officers, and other details. McGarry would be President, Jordan would be Executive Vice President, and Kuehn would be Secretary. The proposed venture would be operated through WRS Manufacture, Inc. and WRS Vision, Inc.

In a March 8, 1990 version of the plan, certain details shifted. Gottesman (and seemingly Jordan) had decided to hold their shares in an as-yet unnamed Swiss corporation which would own 50% of the proposed venture and which would have the power to appoint the two directors that Gottesman and Jordan previously had the individual power to appoint. Jordan would not be an officer.

But in April 1990, the scheme to develop and market the Enlightener suddenly began to deteriorate. Plaintiff filed this lawsuit on April 9, 1990. Shortly thereafter, according to a handwritten note, "Pat" (presumably Patrick McGarry) told Gottesman not to transfer the $250,000.

On May 3, 1990 this court conducted a hearing on plaintiff's motion for a preliminary injunction. As Kuehn would accurately write to McGarry the following day, "[t]hings did not go well for Kolinor at all and the Judge not only granted the injunction but expanded on the original application of Biofeedtrac as well."

At about the same time Gottesman pulled out of the project. He explains now, in a declaration sworn under penalty of perjury, that in late April or early May of 1990, he determined that the Enlightener was not a good investment for him. He says that McGarry had suddenly revealed that the manufacturing cost of each trainer would be $11,000 rather than $3,000.

## C. *The development of the V.T. System*

While the Jordan–Kuehn–McGarry–Gottesman group refined the business plan defendants Alessandro Fossetti and Filippo Pratesi worked to develop a prototype of the Enlightener. They reportedly completed 65% of the work by the fall of 1989, but stopped all work after Jordan failed to make an expected payment. In the spring of 1990 McGarry considered hiring Fossetti as his chief engineer for the production of the Enlightener, but these plans evidently collapsed at about the time this court entered its injunction.

Subsequently Fossetti and Pratesi appear to have gone their separate way. By 1992 they had allegedly developed a new vision trainer—named the V.T. System—also using biofeedback technology. Codina says that he purchased one unit and that it works with entirely different technology than the Biofeedtrac trainer. Dr. Trachtman contends that the V.T. System, too, is manufactured using plaintiff's secrets.

## II

Gottesman and his son, Noam Gottesman, move to dismiss the Complaint as against them for lack of personal jurisdiction.

## A

 Rule 12(d) of the Federal Rules of Civil Procedure provides the court with broad discretion in deciding such motions. A court may conduct a hearing, in which case the plaintiff must demonstrate personal jurisdiction by a preponderance of the evidence. *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 364 (2nd Cir.1986). Or it may decide the question instead based on the pleadings, affidavits, and supporting materials, in which case plaintiff need only make a *prima facie* showing of jurisdiction. *Id.* In this instance plaintiff eventually must establish jurisdiction by a preponderance of the evidence either at a pre-trial hearing or at trial. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981).

Gottesman and his son seek, and the court makes, a decision on the papers presented.

## B

The parties dispute whether the New York state jurisdictional statute should be applied in this case. Plaintiff contends that because section 1965 of the RICO statute provides for nationwide service of process, the court is only constrained, in exercising jurisdiction, by the due process clause of the Constitution and may consider a foreign defendant's contacts with any part of the United States. The Gottesmans contend that this court must follow the laws of New York regarding personal jurisdiction.

Many courts within this circuit and elsewhere have adopted a third view—that a federal court may only exercise jurisdiction over a foreign defendant in a RICO case if the defendant is served in the United States. Because the Second Circuit has not examined this question, this court will address it in some detail.

A federal court's jurisdiction over a defendant depends on a constitutionally sufficient relationship between the defendant and the forum and on defendant's amenability to service of process in the court. *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.Supp. 1279, 1282 (S.D.N.Y.1989).

Rule 4 of the Federal Rules of Civil Procedure provides a starting point for analyzing amenability to service of process. Rule 4(f) provides that "[a]ll process ... may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by these rules, beyond the territorial limits of that state."

Rule 4(e) prescribes two methods for providing service of process outside the state. The first sentence states that:

> Whenever a statute of the United States ... provides for service of a summons ... upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute or order, or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule.

In brief this sentence authorizes service of process to be made under an applicable federal statute.

The second sentence provides that:

> Whenever a statute ... of the state in which the district court is held provides (1) for service of a summons ... upon a party not an inhabitant of or found within the state ..., service may ... be made under the circumstances and in the manner prescribed in the statute....

As the Supreme Court has explained, "[t]he second sentence, as an alternative method, authorizes service of summons 'under the circumstances' prescribed in a state statute or rule. Thus, under Rule 4(e), a federal court normally looks either to a federal statute or to the long-arm statute of the State in which it sits to determine whether a defendant is amenable to service, a prerequisite to its exercise of personal jurisdiction." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 105, 108 S.Ct. 404, 410, 98 L.Ed.2d 415 (1987). This assumes the defendant has not consented to service.

 The RICO statute provides that in all civil actions brought by private parties, all process "may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(d). In other words

the RICO statute does not provide for serving defendants outside the United States.

Some courts have ended their analysis here. They conclude that because the statute does not provide for extraterritorial service of process, a RICO action cannot be brought against persons who remain beyond this country's borders because such persons cannot be served. *See Shaw v. Rolex Watch U.S.A., Inc.*, 745 F.Supp. 982, 987 (S.D.N.Y. 1990); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.Supp. 1279, 1285 (S.D.N.Y.1989); *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F.Supp. 542, 564 (S.D.N.Y.1985). *See also Jose v. M/V Fir Grove*, 801 F.Supp. 349, 356–57 (D.Or.1991); *North Carolina ex rel. Long v. Alexander & Alexander Serv., Inc.*, 680 F.Supp. 746, 749 (E.D.N.C.1988). Several of these courts have reasoned that Congress deliberately made no provision for extraterritorial service because Congress intended only "to rid this country of the havoc wreaked by organized crime." *Brink's Mat Ltd. v. Diamond*, 906 F.2d 1519, 1524 (11th Cir.1990) (Aldisert, J., dissenting).

This court respectfully declines to follow this line of cases. First, Rule 4(e) makes plain that parties may serve a summons as provided either by a federal statute or by the forum state's jurisdictional statute. Absent a plain statement in the RICO statute that persons outside the United States may not be served with process, this court will not ignore the second sentence in Rule 4(e).

■ Second, Congress hardly would have immunized from RICO liability the foreign-based co-conspirators of a racketeering enterprise that conducts its activities here and that injures persons here. Nor would Congress have immunized one who engages in a continuous and systematic pattern of racketeering activity and who then retreats to an off-shore haven hoping to avoid service of process. This court will not construe Congressional silence with respect to extraterritorial service as a Congressional grant of immunity from such service.

This court instead agrees with those courts that have concluded that even though the RICO statute does not provide for extraterritorial service upon persons outside the United States, plaintiff may look to the laws of the state in which the district court sits. *See, e.g., Deem v. Lockheed Corp.*, 749 F.Supp. 1230, 1234–35 (S.D.N.Y.1989). *See also Stauffacher v. Bennett*, 969 F.2d 455, 461 (7th Cir.1992); *Brink's Mat Ltd. v. Diamond*, 906 F.2d 1519, 1523–24 (11th Cir. 1990); *Avianca, Inc. v. Corriea*, 705 F.Supp. 666, 684 (D.D.C.1989).

■ Therefore, to sum up, the court may exercise personal jurisdiction in a civil RICO action over a foreign defendant if (i) the defendant is served within the United States and such exercise of jurisdiction satisfies federal due process requirements, or (ii) the defendant is served without the United States and such exercise of jurisdiction satisfies both federal due process requirements and the forum state's jurisdictional requirements.

## C

Whether or not New York's jurisdictional statutes should be applied here turns on where the Gottesmans were served. There is some ambiguity over that seemingly simple question.

Shortly after plaintiff filed its amended complaint it entered into the following stipulation with the Gottesmans:

> IT IS HEREBY STIPULATED AND AGREED by and between the undersigned that, in order to obviate further attempts by plaintiff formally to notify defendants Dov Gottesman and Noam Gottesman (the "Gottesmans") of this action, Chadbourne & Parke hereby accepts service of process on behalf of the Gottesmans and will not raise a defense of lack of personal jurisdiction based upon lack of service; that Chadbourne & Park is accepting service for notice purposes only and by its doing so the Gottesmans are waiving none of their other defenses with respect to personal jurisdiction. . . .

If the Gottesmans had focused upon this question they would presumably contend that because they were served in New York for "notice purposes" and not for jurisdictional

purposes, the court should not find that they were served in the United States.

The court need not decide now whether the Gottesmans were served here because (i) even if Gottesman was served without the United States, plaintiff has made a *prima facie* case that he is subject to this court's jurisdiction under the New York jurisdictional statutes, and (ii) plaintiff has failed to make a *prima facie* case that the court may exercise jurisdiction over Noam Gottesman under any theory.

### D

The court addresses, first, whether it may exercise jurisdiction over Gottesman.

Section 313 of the New York Civil Practice Law and Rules provides that "[a] person . . . subject to the jurisdiction of the courts of the state under section 301 or 302 . . . may be served with a summons without the state."

#### 1. *Section 301*

■ Plaintiff says that Gottesman is subject to the jurisdiction of this court under section 301, which provides for jurisdiction over persons domiciled or systematically and continuously doing business here.

Plaintiff contends, first, that Gottesman is domiciled here because his wife owns a Park Avenue apartment. This is not correct. Even if Gottesman owned the apartment (and plaintiff has offered no such evidence), that ownership, absent Gottesman's intention to remain indefinitely, does not establish domicile.

■ Plaintiff contends, next, that Gottesman systematically and continuously does business here through N.V. Rubber Cultuur Maatschappij "Amersterdam" (Amersterdam Rubber), and its wholly-owned subsidiary Catz International B.V. Gottesman is the managing director of Amersterdam Rubber, a publicly-owned Dutch corporation.

In order for this court to exercise jurisdiction over Gottesman on the basis of the companies he manages, plaintiff must show that the companies are, in effect, the alter ego of the defendant. *See Ferrante Equip. Co. v. Lasker–Goldman Corp.*, 26 N.Y.2d 280, 283, 309 N.Y.S.2d 913, 916, 258 N.E.2d 202, 204 (1970). Plaintiff has adduced no evidence in support of its conclusory allegations.

Plaintiff contends, last, that Gottesman does business here through Keren Trading Corporation, a company wholly owned by Dov Gottesman's son Yoav. Again, plaintiff has offered no evidence that Keren Trading is Gottesman's alter ego.

#### 2. *Section 302*

■ Plaintiff, on the other hand, successfully makes a *prima facie* case that Gottesman is subject to this court's jurisdiction under section 302(a)(2).

Section 302(a) provides, in pertinent part, that:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, . . . who in person or through an agent:
>
> 1. transacts any business within the state . . .; or
>
> 2. commits a tortious act within the state. . . .

N.Y.Civ.Prac.L. & R. Law § 302(a) (McKinney 1990).

Section 302(a)(2) permits the exercise of jurisdiction over an out-of-state defendant who commits a tortious act within New York either in person or through an agent. Courts have defined "agent" broadly to include not only formal agents but, in certain circumstances, a defendant's co-conspirators. *See, e.g., Allstate Life Insur. Co. v. Linter Group Ltd.*, 782 F.Supp. 215, 221 (S.D.N.Y. 1992); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260, 1266 (S.D.N.Y.1991); *Grosser v. Commodity Exchange, Inc.*, 639 F.Supp. 1293, 1308 (S.D.N.Y.1986), *aff'd*, 859 F.2d 148 (1988).

But to establish jurisdiction on this basis, a plaintiff must (1) make a *prima facie* factual showing of a conspiracy to commit a tort in New York, and (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy. *Chrysler Capital Corp.*, 778 F.Supp. at 1266.

(1) Prima facie showing of conspiracy

To plead a cause of action for conspiracy under New York law, a plaintiff must allege the primary tort and four elements: (a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in furtherance of a plan or purpose, and (d) the resulting damage or injury. *Id.* at 1267.

Plaintiff has made an adequate evidentiary showing of the existence of an agreement intentionally to use deception in an effort to steal plaintiff's technical secrets, existing customers, and prospective customers, thereby causing injury. Plaintiff also offers evidence that in furtherance of such conspiracy, the conspirators sent misleading communications to plaintiff, began to knock-off the Biofeedtrac trainer, formed two Delaware corporations, and committed numerous additional overt acts.

(2) Relationship between Gottesman and the alleged conspiracy

In order to show that a defendant was sufficiently connected with the New York actions of co-conspirators to establish jurisdiction under section 302(a)(2), plaintiff must show that: "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirator in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control,' or 'at the request of or on behalf of' the out-of-state defendant." *Id.* at 1269 (citations omitted).

Gottesman contends that, while others may have conspired to engage in tortious conduct, he never joined the conspiracy. He portrays himself as a passive potential investor who merely listened to a series of business propositions but who took no steps to encourage others to knock-off the Biofeedtrac trainer. Plaintiff, on the other hand, portrays Gottesman as the "mastermind."

Plaintiff's evidence suggests that Gottesman's role fell between the two descriptions. That evidence shows that from as early as July 1989, Gottesman and Jordan began discussions to manufacture and market a trainer to compete with the Biofeedtrac trainer. Kuehn proposed then to pull his friend McGarry into the scheme. Gottesman participated in a telephone call in October with Jordan and Kuehn in which Kuehn informed them that the construction of the proposed trainer would violate the confidentiality and non-competition clauses of the Biofeedtrac–Kolinor distribution agreement, and that plaintiff also had certain patent protections. These facts were repeated, together with Kuehn's proposed plan of deception, in a facsimile transmission dated December 3, 1989 that Gottesman received.

By the spring of 1990 the alleged conspirators had developed a plan in which Gottesman and Jordan would jointly own 50% of the proposed venture. The various plans assumed that Gottesman would make a capital contribution of $250,000 until, shortly after this lawsuit was filed, McGarry seemingly advised Gottesman not to send the money.

After the scheme fell apart, Kuehn telephoned Gottesman and asked him to pay a bill for legal services that Jordan had refused to pay. Although Gottesman, too, refused to pay the bill, Kuehn seemingly believed that he had been performing work on behalf of both Jordan and Gottesman.

While plaintiff has adduced no single item of evidence establishing that Gottesman controlled the conduct of work done in New York in furtherance of the conspiracy, plaintiff has made a *prima facie* case that such New York activities were done at the request or on behalf of Gottesman, that Gottesman knew the scheme would impose injury upon the Brooklyn-based plaintiff, and that the activity of the New York-based Kuehn was intended to advance the objectives of the European-based co-conspirators. At this stage of the litigation plaintiff need show no more in order for the court to exercise jurisdiction over Gottesman.

Gottesman makes no argument, and the court finds no reason to believe, that such exercise of jurisdiction would offend " 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citation omitted).

Gottesman's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court here." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 566, 62 L.Ed.2d 490 (1980).

### E

■ The case as to Dov Gottesman's son Noam is entirely different. For the past five or six years he has been a resident of London, England, where he works for Goldman Sachs International. He is a citizen of Israel and the United States. While he does not do any business in New York in any systematic and continuous way, he visits New York several times a year either for vacation or for Goldman Sachs work.

He is connected to this lawsuit by the thinnest of threads. He was once Dr. Trachtman's patient. Dov Gottesman told Dr. Trachtman in 1988, when the two were discussing a joint venture, that he intended to involve his son Noam in the venture. Noam Gottesman briefly attended a portion of a meeting in London between his father and Dr. Trachtman in 1988 where he only listened. He attended a part of another meeting in London in 1990 where he again listened for 20 to 30 minutes before leaving.

Plaintiff has made no showing that Noam Gottesman should be subject to this court's jurisdiction under any theory. Plaintiff has introduced no evidence that he is domiciled here, that he does systematic and continuous business here, that he committed any tortious act within or without the state, or that he participated in a conspiracy to carry out a scheme to defraud.

Noam Gottesman's motion to dismiss for lack of personal jurisdiction is granted.

### III

Kuehn moves to dismiss counts 8, 9, and 10 of the Complaint, alleging violations of the RICO Act, and count 12, alleging tortious interference with contractual relations. The parties have presented matters outside the pleadings, and the court intends to treat the motion as one for summary judgment.

Accordingly, Kuehn may submit additional papers by April 30, 1993 in support of his motion. He need not re-submit papers annexed to his affidavit of May 12, 1992. Plaintiff may submit responsive papers by May 21, 1993. It need not resubmit papers annexed to the affidavits of Dr. Trachtman, dated August 5, 1992, and William J. Dealy, dated August 10, 1992.

### IV

Plaintiff seeks an order from the court (i) declaring that the Codinas' have defaulted due to their failure timely to answer, (ii) enjoining them from disposing or encumbering property in the United States, and (iii) attaching a residential property in New Jersey.

The Codinas, still residing in Spain, have responded with a letter, written under penalty of perjury, contending that the court does not have personal jurisdiction over them and that, in any event, they have done nothing wrong.

Upon receipt of the letter, the court informed plaintiff that it intended to construe the *pro se* letter as an answer to the Complaint, a response to plaintiff's motion, and a cross-motion to dismiss for, among other reasons, lack of personal jurisdiction.

### A

The Codinas explain that after receiving the Second Amended Complaint they were unable to afford counsel and were uncertain how to proceed. Given that they have offered an excuse for their belated answer, that they could be found liable for more than $30 million if found to have defaulted, and that plaintiff has suffered little or no prejudice by the Codinas' delay in answering the Complaint, the court denies plaintiff's request for a default judgment.

### B

The court now intends to treat the Codinas' letter as a motion, on behalf of themselves and Biotec, for summary judgment. Plaintiff has already submitted an opposing brief and supporting materials addressing the issue of personal jurisdiction.

Plaintiff is directed to submit by April 30, 1993 all material made pertinent to a motion for summary judgment by Rule 56. Plaintiff need not re-submit materials annexed to Dr. Trachtman's affidavit, dated June 24, 1992, and Dr. Trachtman's reply affidavit, dated October 27, 1992. The Codinas and Biotec may submit a reply by May 21, 1993.

## V

### *Summary*

The Gottesman's motion to dismiss for lack of personal jurisdiction is denied with respect to Dov Gottesman and granted with respect to Noam Gottesman.

The two motions to dismiss by defendant Kuehn and by the Codina defendants shall be treated as motions for summary judgment.

So ordered.