BIOFEEDTRAC, INC., Plaintiff,

v.

KOLINOR OPTICAL ENTERPRISES & CONSULTANTS, S.R.L.; George Jordan; Alessandro Fossetti; Marco Vespa; Worldwide Regulation Services, Ltd.; Worldwide Regulation Services, Inc.; WRS Manufacture, Inc.; WRS Vision, Inc.; Patrick G. McGarry; Wendy McGarry; Richard C. Lanzillotto; Christopher Kuehn; Chimitec S.A.S.; Filippo Pratesi; Essinar, Ltd.; Reagan Dees; Dov Gottesman; Noam Gottesman; Biotec Vision, S.A.; Ramon Codina; and Maria Codina, Defendants.

No. CV 90 1169.

United States District Court, E.D. New York.

Sept. 9, 1993.

Manning, Raab, Dealy & Sturm, New York City (William J. Dealy, of counsel), for plaintiff.

Christopher K. Kuehn, defendant pro se.

Ramon Codina and Maria Codina, defendants pro se.

Curtis Morris & Safford, P.C., New York City (Ed Haug, of counsel), for Richard C. Lanzillotto.

Reagan Dees, defendant pro se.

NICKERSON, District Judge:

Plaintiff, a New York corporation that produces and markets a vision training device, brought this action against defendant Kolinor Optical Enterprises & Consultants, S.R.L. ("Kolinor"), its former licensee, alleging that Kolinor was attempting to manufacture and market a competing vision device using plaintiff's technical secrets, in violation of a distribution contract between plaintiff and Kolinor. Kolinor is an Italian company with headquarters in Florence, Italy.

Plaintiff filed an amended complaint, alleging that defendants have violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961–68, and state law. That complaint was dismissed for failing adequately to allege an enterprise. Plaintiffs then filed a second amended complaint on October 28, 1991.

The court assumes familiarity with its previous orders dated May 3 and June 19, 1990 (enjoining Kolinor and those in concert from, among other things, manufacturing a competing vision trainer); June 26, 1991 (dismissing the amended complaint); June 8, 1992 (restraining defendants Ramon Codina ("Codina") and Maria Codina from removing or encumbering assets in the United States); and March 24, 1993, 817 F.Supp. 326 (E.D.N.Y.1993) (exercising personal jurisdiction over defendant Dov Gottesman ("Gottesman") and denying personal jurisdiction over defendant Noam Gottesman).

The court addresses now separate motions by defendant Christopher Kuehn, Esq. and the Codinas. Kuehn moved to dismiss the complaint, and the court notified the parties of its intent to treat the motion as one for summary judgment.

The Codinas contended, in a letter dated September 13, 1992, that the court has no jurisdiction over them and that, in any event, they have done nothing improper. The court informed the parties that it construed the

letter as a motion to dismiss for lack of personal jurisdiction and, alternatively, for summary judgment. Plaintiff responded they it has not yet conducted discovery with the Codinas. Thus, the court addresses solely whether it may exercise jurisdiction over the Codinas.

## I.

The alleged role of the various parties and the background facts of this dispute have been described in detail in the court's previous opinion. 817 F.Supp. at 328–30. The papers show, in summary, the following scheme to defraud and acts by Kuehn and the Codinas.

### A. *The scheme to defraud*

Plaintiff manufactures and holds patents in the United States, Canada, and the United Kingdom for a vision training device that, using the principles of biofeedback, allows a patient to improve visual focusing ability.

Its principal, Dr. Joseph N. Trachtman, entered into a distribution agreement in 1987 with defendant George Jordan, granting his company, Kolinor, exclusive rights to distribute the device in the European Economic Community, Israel, and North Africa. Kolinor entered into a sub-distribution agreement with, among others, Codina, granting him the exclusive right to distribute plaintiff's vision trainer in Spain and Portugal. Each of those agreements expired at the end of 1989.

The papers, construed most favorably to plaintiff, show that beginning in late 1989, Jordan and others engaged in a scheme to manufacture and market a competing vision device using plaintiff's technical secrets, to conceal that scheme from plaintiff through a series of deceptive wire and mail communications, and to conceal that scheme from this court in the course of a preliminary injunction hearing.

### B. *Kuehn's role*

Kuehn first met Jordan in early 1989, when Kuehn was an associate attorney at the New York law firm of Cutner & Rathkopf. In May 1989, Kuehn left that firm and established his own practice in New York. His sole client was Kolinor.

During the following months, he negotiated with plaintiff regarding a plan whereby plaintiff would license Kolinor to manufacture the vision trainer. These negotiations failed.

During that same summer, Kuehn also advised Kolinor regarding its plan to distribute optical equipment in the United States manufactured by an Italian company named Sbizza. Kuehn referred Jordan to defendant Patrick G. McGarry, whose company, defendant Worldwide Regulation Services, Ltd., specialized in international regulatory matters.

By October 1989 Kolinor decided to develop its own vision training device rather than renew its distribution contract with plaintiff. Jordan told Kuehn that he would seek to obtain financing from Gottesman, an investor living in Switzerland who had provided Kolinor with start-up financing.

Kuehn spoke by telephone with Jordan and Gottesman in October, advising them that Kolinor's contract with plaintiff contained confidentiality and non-competition clauses and that plaintiff enjoyed certain patent protections. Soon thereafter, with Kuehn's assistance, Kolinor retained patent counsel in the United States to obtain and analyze plaintiff's patents.

On November 29th, at McGarry's suggestion, Jordan and Kuehn travelled to Chicago for the purpose of examining "optical exhibitors" they expected to see at a medical exhibit. This visit was presumably related to the Sbizza project, but it evidently gave Jordan and Kuehn an opportunity to discuss Jordan's plan to manufacture a competing vision trainer.

In a facsimile transmission dated December 3rd, Kuehn informed McGarry that Jordan was developing a vision trainer to compete with plaintiff's trainer, and he asked McGarry to advise Jordan how to avoid infringing plaintiff's patents.

In a facsimile transmission also dated December 3rd, Kuehn suggested to Jordan that he, Kuehn, would give plaintiff the impres-

sion in contract negotiations that Kolinor was eager to distribute plaintiff's trainer. This would mask Jordan's scheme to manufacture the competing device.

The letter also examined the legal risks of Jordan's scheme. It stated:

6. The vision training device which is being developed will use some of the technology and method which was used in the Biofeedtrac AVT. At this time, it is not clear whether this technology and method is the property (through patents) of Biofeedtrac or simply the application of other, previously known technology. . . .

11. The reaction of the Trachtmans upon learning of the new vision training device can only be guessed at and the procedure and outcome of any litigation they might commence can only be the subject of speculation. . . .

a. In order to evaluate their options, the Trachtmans would first have to purchase one of the new vision training devices which will not be easy to do, since this is a very controlled market. . . .

d. The Trachtmans could also attempt to invalidate international or European patents protecting the new vision training device. . . . In order to evaluate the chances of such proceedings, the final development of the vision training device must be awaited.

e. Lastly, there is also the possibility that the Trachtmans could bring an action against Dr. Jordan personally. Such an action could be based on fraud, and they could claim that Dr. Jordan fraudulently induced them into delivering their technical know-how to them, in order to use the knowledge for his own benefit. Such a suit could be brought in the United States, even though it does not appear that a United States court would have personal jurisdiction over Dr. Jordan. In any event, such a proceeding, while potentially annoying for Dr. Jordan personally, should not affect the operations of the new entity.

Kuehn apparently did not consider whether an action based on fraud might "annoy" anyone within this court's jurisdiction.

In January 1990 Jordan, McGarry, Kuehn, and three of McGarry's employees met in Bohemia, New York, to discuss the Sbizza project and perhaps, the vision trainer project. Kuehn says that during this meeting Jordan asked McGarry to conduct a clinical testing program of plaintiff's vision trainer.

In February McGarry informed Kuehn that McGarry and Jordan had agreed jointly to develop the competing vision trainer that would be named the "Enlightener." At McGarry and Jordan's request, Kuehn (1) arranged to incorporate two Delaware corporations, defendants WRS Vision, Inc. and WRS Manufacture, Inc. (the "WRS Companies"), naming himself as sole initial director; (2) drafted bylaws, organizational minutes, shareholder agreements, and corporate resolutions authorizing the companies to open bank accounts; (3) drafted an organizational and skeletal business plan; (4) agreed to act as corporate secretary for the two entities; and (5) agreed to act as counsel for the WRS Companies, provided that Jordan did not believe such representation would create a conflict of interest.

Throughout this period, technicians working with Jordan in Italy had disassembled plaintiff's vision trainer. The papers raise an inference that Kuehn knew that the device under development would infringe plaintiff's patents and was constructed using plaintiff's technical secrets.

Plaintiff brought this action in April 1990, and the court conducted a preliminary injunction hearing on May 3, 1990.

There is an issue of fact as to whether Kuehn advised defendant Richard C. Lanzillotto to commit perjury at the hearing. When asked in a deposition after the hearing why he had untruthfully denied knowing of a joint venture to build a competing vision trainer, Lanzillotto said he did not know of the venture first hand and that Kuehn had told him before the hearing that he did not have to testify regarding hearsay. Kuehn's explanations of what he told Lanzillotto has shifted during the past several years.

Resolving the facts in favor of plaintiff, the court will assume that prior to and during

the preliminary hearing, Kuehn used mail or wire communications and suborned perjury to conceal from plaintiff and the court the Jordan–McGarry scheme to develop a vision training device.

Immediately after the May 3rd hearing, Kuehn resigned from his representation of the WRS Companies. Kolinor and Jordan stopped communicating with Kuehn, and, according to Kuehn, refused to pay him for services rendered since January 1990.

Kuehn says that he has no involvement since the May 3rd hearing with any of the persons in Italy who are now manufacturing and distributing a vision training device—named the "V.T. System"—that, plaintiff says, was designed using plaintiff's secrets. Plaintiff offers no evidence that Kuehn's participation with the co-conspirators continued after May 1990.

In summary, the papers, construed in the light most favorable to plaintiff, show that Kuehn knew that Jordan, McGarry, and others were engaged in a fraudulent scheme to manufacture a vision training device in violation plaintiff's contractual and, perhaps, patent rights. Kuehn advised Jordan how to avoid detection and to minimize the legal risks of such a scheme, negotiated with plaintiff during this period to prevent it from discovering the scheme, performed ministerial legal tasks in advancing the project, and advised one participant that he could mislead this court.

### C. *The Codinas' role*

In a letter sworn to under penalty of perjury, the Codinas report the following.

They currently reside in Barcelona, Spain. He is a citizen of Spain; she is a citizen of the United States. Prior to moving to Spain in 1988, one or both of them were treated for vision problems by Dr. Trachtman in New York. They apparently found the treatment successful, at least for a time, and Codina decided to establish vision training clinics to treat patients with vision disorders using plaintiff's trainer.

Dr. Trachtman directed Codina to Kolinor, the European distributor, and in May 1988 Kolinor and Codina entered into a sub-distri-bution contract, granting Codina the exclusive right to distribute and use plaintiff's device in Spain and Portugal.

Codina then created defendant Biotec Vision, S.A. ("Biotec"). He is president and Maria Codina is an officer.

In mid–1989 Dr. Trachtman told Codina that plaintiff probably would not renew the distribution agreement with Kolinor at the end of 1989. The two began to discuss an agreement whereby Biotec would purchase vision trainers directly from plaintiff, at a modest cost saving to Biotec.

As these negotiations intensified at the end of 1989, Codina informed Dr. Trachtman that he was concerned about his ability to make even limited repairs to plaintiff's vision trainers which, Codina says, were frequently broken. Dr. Trachtman agreed to and did provide some repair instructions to a Spanish technician sent by Biotec to Brooklyn in December 1989.

By early 1990 the negotiations between Codina and Dr. Trachtman began to sour. Dr. Trachtman insisted that he would only grant Biotec a distribution deal if plaintiff received 10% of Biotec's shares, together with a shareholder agreement that, according to Codina, would give plaintiff the power of a half-owner. Codina found the terms unacceptable.

Between January and April 1990 Codina made numerous unsuccessful efforts to induce Dr. Trachtman to repair two broken vision trainers. At one point he sent two agents to New York with two broken trainers, seeking repairs.

On April 27, 1990 defendant Reagan Dees, the sub-distributor of the plaintiff's vision trainer in England, informed Codina that McGarry was completing the manufacture of a vision trainer named the Enlightener and that McGarry would offer Codina an exclusive distribution agreement for Spain and Portugal. Dees explained that McGarry needed a non-binding letter of intent. Within a week Codina sent such a letter to McGarry "to confirm Biotec Vision's intent to purchase 10 units of the Enlightener during the period ending December 31, 1991, subject to signing an Exclusive Distribution Agree-

ment for Spain and Portugal, at a price of US$20,000 each for a total of US$200,000."

McGarry later repaired two of plaintiff's trainers at Codina's request. Codina admits that Biotec also paid McGarry's company $20,000 for an Enlightener, but he says it never worked because it was missing the optical part. He also says that he purchased one of the V.T. Systems and that it works with entirely different technology than plaintiff's vision trainer.

In reply to the Codinas' letter, plaintiff submitted evidence that confirms facts provided by Codina and that adds few specific details to the Codinas' account. Plaintiff contends that Codina must have conspired with McGarry long before Codina made his non-binding commitment to purchase ten Enlighteners, reasoning that such a sophisticated businessman would not make so substantial a commitment to a stranger.

Plaintiff submits deposition testimony showing that Codina personally delivered his broken trainers to McGarry for repair in August 1990, and at that time, the two discussed McGarry's proposal that Codina set up vision training clinics "all over Europe" using the Enlightener. McGarry attempted to induce Codina to invest 50,000 British pounds into the venture.

McGarry subsequently travelled to Spain to deliver a non-functioning Enlightener "prototype." McGarry had apparently had his engineers cut off an end of one of plaintiff's trainers and encase the unit in a new external housing in order to lead Codina to believe that the Enlightener was in production. Codina paid McGarry $20,000 for the unit and received an invoice, dated November 9, 1990, signed by McGarry.

## II.

Kuehn moves to dismiss or for summary judgment on counts 8, 9, and 10 of the complaint, alleging violations of §§ 1962(b)–(d) of the RICO Act, and count 12, alleging tortious interference with contractual relations.

### A.

### The RICO Claim

The question is whether the RICO Act imposes civil liability on an attorney who provides legal advice and legal services to clients, intending the advice and services to advance the clients' scheme to defraud.

Section 1964(c) of the RICO Act provides that "[a]ny person injured ... by reason of a violation of section 1962" of the Act may sue for treble damages and attorney's fees. Plaintiff contends that Kuehn violated §§ 1962(b), (c), and (d).

### 1. *Section 1962(b)*

■ Section § 1962(b) prohibits a person from acquiring or controlling an enterprise through a pattern of racketeering activity. The complaint nowhere suggests, and the papers nowhere show, that any of the defendants' profits from a pattern of racketeering activity were used to acquire control of any enterprise.

Accordingly, plaintiff makes no showing that Kuehn or any other defendant violated § 1962(b).

### 2. *Section 1962(c)*

■ Section 1962(c) provides that, "[i]t shall be unlawful for any person ... associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

In *Reves v. Ernst & Young,* —— U.S. ——, —— – ——, 113 S.Ct. 1163, 1172–74, 122 L.Ed.2d 525 (1993), the Supreme Court held that a person violates § 1962(c) only if that person "participates in the operation or management of that enterprise itself." The Court reached that conclusion by looking at the language of the statute and by reasoning that, as a verb, "conduct" means "to lead, run, manage, or direct." —— U.S. at ——, 113 S.Ct. at 1169. Therefore, liability under § 1962(c) may not be imposed on one who merely "carries on" or "participates" in an enterprise's affairs. *Id.* at ——, 113 S.Ct. at 1169–70. Instead, one must have "*some* part in directing the enterprise's affairs." *Id.* at ——, 113 S.Ct. at 1170 (emphasis in original).

Applying that test the Court found that accountants, who had knowingly over-valued an asset on a corporation's balance sheet thereby misrepresenting the corporation as solvent, had not violated § 1962(c) because they had not had a part in directing the affairs of the enterprise.

In his dissent Justice Souter observed that the accountants had stepped into the shoes of management by creating the very financial records they audited and, thus, had gone beyond the purview of independent accountants. In rejecting this view, the Court held, by its silence, that even when professionals go beyond their customary role, they will not be deemed to have participated in "the operation or management of the enterprise itself." The Court noted, nevertheless, that "we need not decide in this case how far § 1962(c) extends down the ladder of operation." *Id.* at —, 113 S.Ct. at 1173 n. 9.

The lower courts have not yet shed much light on how far "down the ladder" the "operation or management" test will descend. In *Nolte v. Pearson*, 994 F.2d 1311 (8th Cir. 1993), the court held that attorneys who prepared allegedly false opinion letters and informational memoranda regarding a music recording leasing program had not participated in the "operation or management." *Id.* at 1317.

In *Gilmore v. Berg*, 820 F.Supp. 179 (D.N.J.1993), the court reached the same conclusion regarding an attorney who had prepared false private placement memoranda regarding limited partnerships. The court found that the attorney had played no role in initiating or formulating the process of syndication, and was not "directing the legal entities he represented to engage in particular transactions." *Id.* at 183. *See also Fidelity Fed. Sav. & Loan Ass'n v. Felicetti,* 830 F.Supp. 257, 1993 WL 254404 (E.D.Pa.1993) (holding that retained real estate appraisers, who knowingly prepared misleading property appraisals, were not part of the operation or management of the enterprise).

While Kuehn may have been more intimately connected to the operation of the alleged enterprise here than the professionals in *Reves, Nolte, Gilmore,* or *Felicetti,* this court nevertheless finds no evidence that that Kuehn participated in the operation or management of the enterprise.

As revealed by the many facsimile transmissions from Kuehn contained in the record, Kuehn's role was confined, at all times, to providing legal advice and legal services. None of the papers show that he participated in Jordan's decision to manufacture a competing vision trainer or in Jordan and McGarry's decision to develop the device as a joint enterprise.

At no time does he appear to participate in or even offer an opinion regarding a business point. The closest he comes—suggesting that the Kolinor renewal contract negotiations be used to mislead plaintiff—remains within the realm of legal advice.

Unlike Gottesman, Jordan, McGarry, Worldwide Regulatory Services, Ltd., and Dees, Kuehn was to have no vote as a shareholder. Unlike Jordan, former defendant Charles Beverly, and a third employee of the WRS Companies, he was to have no employment contract. As far as can be determined, he received minimal remuneration for his services and was to receive no remuneration other than ordinary fees for legal services, had the enterprise succeeded.

The court places no weight on the facts that Kuehn was the sole director, and later would become corporate secretary of the WRS Companies. Corporate counsel customarily fill such roles without becoming a part of the operation or management of the enterprise.

Plaintiff cites cases holding that attorneys who conduct themselves in a manner similar to Kuehn may be liable for securities fraud, *see, e.g., United States v. Benjamin,* 328 F.2d 854 (2d Cir.1964); *Securities and Exch. Comm'n v. Frank,* 388 F.2d 486 (2d Cir. 1968), and for a breach of fiduciary duty, *see, e.g., Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1080 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978). This court has no quarrel with plaintiff's contention that Kuehn should be liable in some form. But those courts did not hold the attorney defendants liable for treble damages and attorneys fees under the RICO Act.

In conclusion, plaintiff has adduced no facts to suggest that Kuehn's actual or projected role was to "lead, run, manage, or direct" any part of the enterprise. Thus, he did not participate in the "conduct" of an enterprise and did not violate § 1962(c), even though he may have intentionally assisted a scheme to defraud.

### 3. *Section 1962(d)*

Section 1962(d) makes it unlawful to conspire to violate § 1962(c). Plaintiff has neither alleged nor adduced any evidence that Kuehn agreed to do any acts other than those acts already discussed. Thus, the court cannot conclude that he conspired to participate in the operation or management of the enterprise.

### B.

### *State laws claims*

### 1. *Tortious interference with contract*

Count 12 of the complaint alleges that all defendants, except Kolinor, Jordan, Alessandro Fossetti, and Marco Vespa, tortiously interfered with the existing contract between Kolinor and plaintiff. Kuehn moves to dismiss this count.

 To establish a claim for tortious interference with contractual relations against Kuehn under New York law, the complaint must allege (1) the existence of a valid contract between plaintiff and Kolinor; (2) Kuehn knew of the contract; (3) Kuehn intentionally and improperly induced the breach of that contract; and (4) damages resulted therefrom. *See Telerate Systems, Inc. v. Caro,* 689 F.Supp. 221, 225 (S.D.N.Y. 1988); *Universal City Studios, Inc. v. Nintendo Co.,* 797 F.2d 70 (2d Cir.), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986).

Plaintiff has not alleged nor adduced any facts suggesting that Kuehn intentionally used his position of trust improperly to persuade Jordan, against Jordan's better judgment, to breach the Kolinor contract with plaintiff. The claim against Kuehn for tortious interference with contractual relations is dismissed without leave to replead.

### 2. *Breach of confidential information*

The complaint alleges in Count 13 that all defendants wrongfully used and exploited plaintiff's trade secrets and confidential information. Kuehn has made no motion to dismiss this count, and the court does not address it.

### 3. *Common law fraud*

The complaint does not allege that Kuehn or anyone else engaged in a scheme to defraud plaintiff in violation of the common law. Given that, under *Reves,* a defendant may participate in a scheme to defraud yet not violate the RICO Act, plaintiff has leave to amend the complaint to add a common law fraud claim. None of the defendants can persuasively show prejudice by such an amendment as each has long had notice of the RICO fraud claims in the complaint.

Certainly as long as plaintiff has active, unresolved federal claims against other defendants in this case, the court will exercise supplemental jurisdiction to consider common law fraud claim against Kuehn and others. *See* 28 U.S.C. § 1367(a).

### III.

The Codinas move to dismiss the complaint as against them for lack of personal jurisdiction. Because they are not available to attend a hearing and have not retained counsel, the court decides the motion based on the pleadings, affidavits, and supporting materials. Plaintiff need only make a *prima facie* showing of jurisdiction. *See Biofeedtrac,* 817 F.Supp. at 331.

The Codinas were served with a copy of the summons and complaint while outside the United States. Thus, for reasons explained in the court's previous opinion, plaintiff must show that the exercise of jurisdiction satisfies the New York State jurisdictional statute and federal due process. *Id.* at 332. The relevant New York statutory provisions are sections 301 and 302 of the New York Civil Practice Law and Rules.

Plaintiff makes no contention that the Codinas are subject to jurisdiction under section 301. That section provides for jurisdic-

tion over persons domiciled or systematically and continuously doing business here. It plainly does not describe the Codinas' relationship to this state.

Section 302(a), the so-called "long-arm" statute, provides, in pertinent part, that:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, . . . who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state . . .; or

3. commits a tortious act without the state causing injury to person or property within the state . . . if he . . .

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce. . . .

N.Y.Civ.Prac.L. & R.Law § 302(a).

### A. *Section 302(a)(1)*

■ Plaintiff seeks to base jurisdiction on a New York business transaction, in December 1989, in which Codina and Biotec sent a technician to Brooklyn to learn how to repair plaintiff's trainers. Dr. Trachtman contends that he opened a sealed portion of a trainer, allowing the technician to discover closely-held secrets.

Plaintiff also contends that, at other times, one of the Codinas or their agents came to New York and learned secrets here.

But the papers cast doubt on the contention that the Codinas learned material technical secrets about plaintiff's trainer through these or any other means. During the six months after their technician travelled to New York, the Codinas made substantial unsuccessful efforts to get plaintiff to repair its trainers. During the summer of 1990, after Dr. Trachtman had failed to provide repairs, Codina travelled to England where he met with McGarry who had said he could make the repairs. If the Codinas had possessed secret technical information sufficient to as-

sist others in knocking-off plaintiff's trainer, · the court would expect that they could repair broken trainers.

Even if the Codinas had learned secret information, plaintiff has adduced no evidence that the Codinas transferred any secrets to McGarry, Jordan, or anyone else. No where in the many affidavits, documents, and deposition testimony submitted to this court does anyone even hint that the Codinas contributed any technical information to the effort to knock-off plaintiff's trainer.

Moreover, plaintiff has offered evidence that Kolinor's technicians in Italy had disassembled plaintiff's trainer and, no doubt, had opened any sealed parts. Any secrets that the Biotec technician might have learned were readily available to the more highly-skilled Italian group building the Enlightener.

Thus, plaintiff makes no *prima facie* showing that their claims against the Codinas arise from a business transaction that occurred in New York.

### B. *Section 302(a)(2)*

■ Plaintiff contends, next, that the Codinas participated in a conspiracy whose members committed tortious acts within New York. As this court explained in its prior opinion, plaintiff must (1) make a *prima facie* factual showing of a conspiracy to commit a tort in New York, and (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy. *Id.* at 333.

The court has already held that plaintiff has made a *prima facie* showing that McGarry, Jordan, Gottesman, and others engaged in a conspiracy that exercised some control over co-conspirators here. *Id.* at 334.

To show that these Codina defendants were sufficiently connected with the New York actions of co-conspirators to establish jurisdiction under section 302(a)(2), plaintiff must show that: "(a) the defendant had an awareness of the effects in New York of its activities; (b) the activity of the co-conspirator in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirator acting in New York acted 'at the direction or under the control,' or 'at the

request of or on behalf of" the out-of-state defendant." *Id.* (citations omitted).

The papers make no showing that the Codinas exercised any influence or control over any co-conspirators active in New York, or even that they knew of tortious acts being conducted here. The papers show that (1) Codina conditionally agreed in May 1990 to purchase vision training devices from McGarry, (2) Codina met McGarry in England in August 1990 and listened to McGarry's suggestion that Codina set up clinics in Europe, and (3) Biotec later purchased a non-functioning vision trainer from McGarry at a cost of $20,000.

Codina's role was entirely unlike Gottesman's role, over whom this court found personal jurisdiction in its previous decision. 817 F.Supp. at 334. Through the winter and spring of 1990, Gottesman had engaged with McGarry in extended negotiations and had reviewed organizational and business plans and a shareholder agreement that would have given Gottesman significant formal control over the WRS Companies.

Codina, in contrast, is not mentioned in any of the proposed organizational and business plans or in the many communications among the parties that comprise the now voluminous record of this case. None of the depositions suggests that Codina had anything more than a glancing connection with the McGarry–Jordan scheme.

At most, the papers show that Codina and Biotec were prospective buyers of the Enlightener. But Codina evidently knew so little about the Enlightener that he paid $20,-000 for a non-functioning prototype.

Plaintiff adduces no facts warranting an inference that the Codinas had any influence over activities in New York and that they knew of activities in New York.

C. *Section 302(a)(3)*

■ Plaintiff suggests no grounds on which the court may exercise jurisdiction over the Codinas under section 302(a)(3). The Codinas evidently operated vision training centers solely in Spain. While the agreement with Kolinor also allowed them to distribute plaintiff's trainer in Portugal, plaintiff offers no evidence that they have done so and, if so, that the Codinas' revenue from such "international commerce" can be characterized as "substantial."

To subject these owners and officers of vision training clinics in a distant land to this court's jurisdiction would be unfair, burdensome, and not contemplated by any section of the New York long-arm statute.

## IV.

### Conclusion

Kuehn's motion for summary judgment with respect to the RICO claims and the claim for tortious interference with contractual relations is granted.

Plaintiff may amend the complaint to add a common law fraud claim against Kuehn and others.

The Codinas' motion to dismiss for lack of personal jurisdiction is granted. The court further concludes, on its own motion, that it may not exercise jurisdiction over Biotec. All claims against Ramon Codina, Maria Codina, and Biotec are dismissed.

Plaintiff is relieved of its obligation to maintain the bonds it posted.

So ordered.