25 F.3d 1048
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 GENERAL ENVIRONMENTAL SCIENCE CORP.,
Plaintiff-Appellee/Cross-Appellant,
v.
Frank L. HORSFALL; John L. Strauss; Biosys Corporation;
Gustavo Gysler, Defendants-Appellants,
Stephen Walters; Jason C. Blackford; Thomas C. Buford,
Cross-Appellees.
 Nos. 92-4110 to 92-4114.
 United States Court of Appeals, Sixth Circuit.
 May 25, 1994.
 
 Before: MILBURN and GUY, Circuit Judges; and BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 In this commercial dispute, plaintiff moved the district court for sanctions, citing what it perceived to be defendants' and defense counsel's abuse of the discovery process. The district court granted plaintiff's motion and imposed the ultimate sanction against defendants by entering a default judgment against them. The court also sanctioned defense counsel by holding them jointly and severally liable for plaintiff's attorneys' fees and expenses. Subsequently, defense counsel successfully moved the court to amend its order, thereby eliminating their own, if not their clients', liability under the judgment.
 
 
 2
 Defendants now appeal the default judgment entered against them as well as the district court's award of damages. Plaintiff cross-appeals, arguing that the district court erred in reversing its decision to sanction defense counsel. For the following reasons, we vacate the default judgment and remand for proceedings consistent with this opinion. With regard to plaintiff's cross-appeal, on the other hand, we affirm.
 
 
 3
 I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
 
 
 4
 This case, with its long and labyrinthine procedural history, arises out of a commercial dispute between plaintiff General Environmental Science Corporation ("GES"), an Ohio corporation, and defendants Frank L. Horsfall, John L. Strauss, Gustavo Gysler, and Biosys Corporation, S.A., a Swiss corporation. GES specializes in the manufacture, distribution, and sale of microbiological products. GES's principal product, commonly referred to as "LLMO," is used to treat sewage and aquarium water.
 
 
 5
 In November 1989, GES and Biosys, which was known as X-O Corporation at the time, entered into an agreement ("LLMO Agreement") establishing Biosys as GES's exclusive distributor for selected European countries. This agreement contained (1) a definition of "trade or business secrets"; (2) a clause prohibiting Biosys and its employees from manufacturing, distributing, or selling products competitive with GES products for the duration of the agreement plus one additional year thereafter; (3) a guarantee by GES that it would maintain the quality of its products; (4) a provision permitting either party to cancel the agreement "should Distributor not fulfill minimum quantities during a given year[ ]" (app. 81); and (5) a choice of law/forum selection clause.
 
 
 6
 At the time, Gysler, Horsfall, and Strauss not only held substantial ownership interests in Biosys,[1] but also were high-level company employees: Gysler was Biosys's "administrator"--the equivalent of its chief executive and financial officer; Horsfall was its technical director; and Strauss was in charge of planning and directing marketing strategies. That GES would retain Biosys as a distributor was explained in part by the fact that both Horsfall and Strauss had previously worked for GES, Horsfall having served as a consultant and as Vice President of Research and Development and Strauss as a sales representative to Europe and the Middle East.[2]
 
 
 7
 Despite indications that both GES and Biosys were profiting from their stillnascent agreement, the deal they had strick soon went sour. Citing problems with the quality of GES's products, Biosys informed GES in May 1990 that it was terminating their relationship. For Biosys, however, the end of this endeavor would mark the beginning of another one; on the same day the death knell sounded for Biosys's agreement with GES, Gysler formed Biosphere, S.A., a company that was, in many respects, indistinguishable from Biosys. As GES observes, Biosys and Biosphere shared the same directors, managers, employees, business purposes, and telephone and facsimile facilities. Moreover, the companies even sold products under substantially identical names.
 
 
 8
 GES did not attribute the coincidence of these two maneuvers or the similarity between Biosys and Biosphere to mere fortuity. Instead, GES filed the instant action, claiming that defendants had created Biosphere as an "alter ego" corporation to unlawfully compete with GES.[3] In addition to listing numerous state tort claims, GES's 18-count complaint alleged misappropriation of trade secrets, violations of agreements not to compete, and violations under the Racketeer Influenced and Corrupt Organizations Act ("RICO").[4] GES sought money damages and a declaratory judgment, as well as injunctive relief prohibiting defendants from competing with GES and from using its trade secrets.
 
 
 9
 Subsequently, the district judge (Battisti, J.) denied GES's motion for a temporary restraining order and ordered expedited discovery to be completed by September 30, 1990. The judge also set October 29, 1990, as the hearing date for GES's preliminary injunction motion. Discovery began in earnest on August 3, 1990, when GES served defendants with its first set of interrogatories and a request for production of documents.[5] In addition, on August 13, 1990, and August 14, 1990, GES served notices of deposition on Horsfall and Strauss, respectively. Horsfall responded by moving for a protective order and requesting an extension of his deposition date. Regarding the former, he noted that revealing the trade secrets of his employer might subject him to prosecution under Article 273 of the Swiss Penal Code, which provides in pertinent part:
 
 
 10
 "Whoever makes available a manufacturing or business secret to a foreign governmental agency or a foreign organization or private enterprise or to an agent of any of them; shall be subject to imprisonment and in grave cases to imprisonment in a penitentiary.
 
 
 11
 The imprisonment may be combined with a fine."
 
 
 12
 United States v. Vetco, Inc., 691 F.2d 1281, 1287 (9th Cir.), cert. denied, 454 U.S. 1098 (1981); see also id. ("The term 'business secret' has been defined to include 'all facts of business life to the extent that there are interests worthy of protection in keeping them confidential.' ").
 
 
 13
 On August 29, 1990, Horsfall answered GES's complaint and asserted a counterclaim. Horsfall also filed a motion for leave to apply Swiss law to the interpretation of the LLMO Agreement and to the definition of trade secrets. Thereafter, Horsfall was deposed for four days. During his deposition, Horsfall responded to most, but not all, of GES's questions. Under instructions from Gysler, Horsfall declined to answer some questions for fear that, by answering, he would thereby subject himself to criminal charges in Switzerland.
 
 
 14
 Concluding that discovery in the instant action was governed by American, not Swiss, law and characterizing Horsfall's argument based on Article 273 (the "Swiss Penal Code Objection") as "nothing more than slight of hand" (app. 197), the district judge denied Horsfall's motion for a protective order on September 14, 1990 ("September 14 order"). For both Horsfall and Strauss, the timing of the judge's ruling was somewhat inauspicious. As Horsfall points out, by the time the judge issued this ruling, he had already answered GES's interrogatories, and his deposition was already completed. Strauss, on the other hand, did not learn of the ruling until sometime after his own deposition commenced on September 19, 1990. Thus, when Strauss served GES with his interrogatory answers on September 18, 1990, and when he fielded questions early on in his deposition, he did so under the assumption that he could be unresponsive to the extent Swiss law would proscribe, under threat of criminal prosecution, disclosure of the requested information. When Strauss finally did learn of the judge's order, he answered questions regarding Biosys, although he declined to answer those involving trade secrets or Biosphere.
 
 
 15
 The September 14 order did little to stem the pace or volume of the motion practice in this case. For instance, on September 20, 1990, GES filed a motion to compel discovery. Five days later, Biosys and Gysler, a Swiss national, moved the court for a protective order against requiring them to travel to Cleveland for their scheduled depositions. Then, on October 19, 1990, all defendants sought a protective order preventing the disclosure of trade secrets and other confidential information contained in various patent applications that were subject to discovery by GES. In addition, on October 29, 1990, arguing that GES had not answered interrogatories that had been served on the company in August, Horsfall filed his own motion to compel discovery.
 
 
 16
 A hearing on GES's September 20 motion to compel, which challenged the validity of the Swiss Penal Code Objection as it pertained to Biosphere and the trade secrets at issue, was held on February 6, 1991. Before ruling on the matter, however, the district judge, sua sponte, disqualified himself from the case pursuant to Local Rule 7.09(1). The circumstances underlying Judge Battisti's decision, though not themselves the subject of this appeal, are worth mentioning. On February 13, 1991, the Cleveland Plain Dealer published a report identifying Robert Rotatori as the attorney Judge Battisti had retained to represent him in an on-going federal investigation into his handling of a 1988 case. As it turned out, Rotatori was a partner in the law firm of Gold, Rotatori, Schwartz & Gibbons ("Gold, Rotatori"), one of two firms that, as of February 1991, was representing GES in the instant action.
 
 
 17
 The day after Judge Battisti issued his order of disqualification, Niki Z. Schwartz and Richard L. Stoper, Jr., the Gold, Rotatori attorneys handling the GES matter, moved the court to withdraw as co-counsel for GES. In the aftermath of Gold, Rotatori's withdrawal, Jerome Weiss of Weiss & Associates, now the only firm representing GES, urged Judge Battisti to seek reassignment to the case. Weiss maintained that any appearance of impropriety had been cured by Gold, Rotatori's withdrawal. Judge Battisti evidently agreed, for he subsequently urged Chief Judge Thomas Lambros to reassign him to the case, stating:
 
 
 18
 Mr. Weiss has requested that I maintain the case on my docket. In light of the extensive wrangling involved in the discovery process to date, it seems that it is in nobody's interest to start the whole process over again before another judge. Inasmuch as I have already recused myself, the matter is in your hands. I have no objection to the reassignment of this case to my docket.
 
 
 19
 (App.1919.) Judge Lambros granted his colleague's request on March 6, 1991.
 
 
 20
 Picking up where the case had left off, Judge Battisti issued an order on April 4, 1991 ("April 4 order"), in which he took a number of actions. For instance, noting that "the evidence presented by the Plaintiff is overwhelming" and that GES "seeks to acquire documents that go to the very heart of its allegations," General Envtl. Science Corp. v. Horsfall, 136 F.R.D. 130, 132 (N.D.Ohio 1991), he granted GES's motion to compel discovery and for attorneys' fees. He also reaffirmed his rejection of defendants' Swiss Penal Code Objection, directing defendants to produce documents from Switzerland (including those pertaining to Biosphere) and to make themselves available for deposition within 20 days.[6] In addition, he granted Horsfall's motion to compel discovery, although he acceded to GES's request for a confidentiality order in this regard. Finally, Judge Battisti denied defendants' collective and Gysler's and Biosys's separate motions for a protective order.
 
 
 21
 On April 18, 1991, GES noticed defendants that their depositions were to take place on April 22, 1991. Prior to the expiration of the deadline set forth in the court's April 4 order, defendants assured GES that they were making a good faith effort to cooperate in the discovery process. Notwithstanding these assurances, defendants were not deposed nor did they produce documents before the 20-day period elapsed. Indeed, by the time document production began on April 30, 1991, GES already had filed a motion for sanctions, seeking default judgments against all defendants for their failure to abide by the terms of the court's order and attorneys' fees against both defendants and defense counsel. GES's motion recounted specific instances of alleged misconduct on the part of defense counsel, including their continued reliance on the Swiss Penal Code Objection, notwithstanding the court's prior rulings on the matter; their failure to promptly notify all defendants about the substance of the court's April 4 order; and their failure to appear for the properly noticed depositions of their clients.
 
 
 22
 Defendants and their counsel responded by filing two motions of their own. First, on May 1, 1991, defense counsel requested additional time to respond to GES's motion "to allow for adequate time for counsel and to clarify whether and to what extent conflicts may be raised by the nature of the motion to compel." (App. 901.) The possibility of conflict arose in this instance, defense counsel observed, "in that the motion seeks sanctions both against counsel and the parties for alleged discovery failures and/or violations of court orders." (App. 900.) The following day, defendants moved the court to extend the 20-day time period for completion of discovery established by its April 4 order. Judge Battisti considered these motions along with GES's motion to compel at a hearing held on May 15, 1991. At this hearing, the judge ordered defendants to comply with GES's discovery requests by May 21, 1991, and "warned defense counsel that further intransigence on Defendants' part could lead to the imposition of ultimate sanctions." General Envtl. Science Corp. v. Horsfall, 141 F.R.D. 443, 447 (N.D.Ohio 1992).
 
 
 23
 On May 24, 1991, pursuant to Gysler's instructions, defendants filed under seal "A7077," a Biosphere document "contain[ing] formulations of various products and constitut[ing] a trade secret of the most sensitive nature." (App. 962.) In their filing, defendants asserted that they "are prepared to satisfy this Court in camera, short of disclosure to Plaintiff or to Plaintiff's counsel, that the formulations on document A7077, differ in type and kind from the formulations of Plaintiff's products to which any Defendant herein had access at any time in the past." (App. 962-63.)
 
 
 24
 Also on May 24, 1991, Judge Battisti issued an order ("May 24 order") requiring defendants to produce all requested documents and directing defendants Horsfall, Strauss, and Gysler to appear for depositions on May 28, June 4, and June 11, respectively. The order also awarded GES costs and attorneys' fees incurred in attempting to obtain defendants' compliance with the April 4 order and enjoined defendants from engaging in various activities, such as competing with GES in the manufacture, distribution, or sale of microbiological products and using GES trade secrets.
 
 
 25
 The fact that defendants' depositions took place as scheduled[7] did not stop GES from renewing its motion for sanctions on August 27, 1991. Again, GES sought a default judgment and injunctive relief. Although GES also alleged that defendants had violated the court's May 24 injunction (prohibiting competition and the use of trade secrets), the primary basis for GES's motion was defendants' filing of A7077. GES argued that defendants' filing of A7077 under seal was, in effect, a ruse designed to withhold evidence already deemed discoverable by the court.[8] In fact, the company asserted that, by filing the document under seal, defendants contravened the "Order of Confidentiality entered on April 4, 1991 which the Court had entered by way of rejecting defendants' claims that confidential documents could be withheld from plaintiffs." (App. 979.) Moreover, GES disparaged defendants' rationale for not producing the document. Defendants had argued that the court implicitly approved of their actions with respect to A7077 by not mentioning the document in its May 24 order. As GES pointed out, however, given the fact A7077 was filed only 13 minutes before the ruling was issued, the judge most likely did not even consider, let alone authorize, the filing.
 
 
 26
 On November 6, 1991, remarking that Biosphere had authorized its release, defendants finally provided GES with a copy of A7077. Then, on November 22, 1991, GES filed a supplemental memorandum charging that defendants had, beginning in August 1990, systematically destroyed predecessor documents to A7077. GES argued that these earlier documents would have facilitated its effort to determine "which of plaintiff's trade secrets defendants used to develop the products they currently sell." (App. 1593.) In all, six generations of the A7077 document, each representing different stages in the evolution of defendants' products, were alleged to have been destroyed. GES singled out Horsfall, who, GES maintained, destroyed not only the documents themselves but also the notes that accompanied them. GES impressed upon the court that such destruction occurred while discovery requests were pending.
 
 
 27
 GES's memorandum also urged the imposition of sanctions against defense counsel, based in part on counsel's handling of A7077. GES argued that sanctions were appropriate because "[c]ounsel has been implicated in this case from the very beginning." (App. 1666.) In particular, GES alleged that defense counsel (1) approved of defendants' "scheme which led to this entire case" (id.) (footnote omitted); (2) "engag[ed] in every possible obstructive discovery tactic" (id.); (3) contributed to the destruction of evidence; (4) withheld A7077 in violation of the court's discovery orders; and (5) advised defendants that they could continue to compete with GES despite the court's prior rulings to the contrary.
 
 
 28
 Defense counsel first learned of this latest salvo on November 25, 1991, the day before the scheduled hearing on GES's renewed motion. Defense counsel proceeded to prepare a responsive memorandum that denied GES's allegations, while noting that "[a]t this eleventh hour with the Defendants thousands of miles away, counsel for Defendants cannot respond fully." (App. 1710 n. 2.) Arguing that GES offered no evidence to support its claims, the memorandum also disputed the propriety of sanctioning defense counsel. The hearing on GES's motion for sanctions took place as scheduled on November 26, 1991. At this hearing, Horsfall denied having destroyed documents pertaining to the instant action. On cross-examination, however, he acknowledged that he "discarded" sheets of paper detailing different product formulations.[9] At the close of the hearing, Judge Battisti instructed GES's counsel to submit proposed findings of fact and conclusions of law within 10 days.
 
 
 29
 Horsfall returned to Switzerland after the hearing and, upon searching his office, was able to locate two of the six A7077 predecessor documents previously thought lost. On December 2, 1991, Horsfall faxed the documents to Gysler and defense counsel. GES maintains that defense counsel did not promptly inform plaintiff's counsel of Horsfall's discovery even though they knew GES was in the process of drafting proposed findings of fact and conclusions of law. Only after plaintiff's counsel had filed their findings and conclusions on December 6, 1991, did defense counsel then provide GES with these predecessor documents.
 
 
 30
 On March 10, 1992, Judge Battisti granted GES's renewed motion for sanctions and entered a default judgment against defendants pursuant to Rule 37 of the Federal Rules of Civil Procedure. Judge Battisti also ordered defendants and their counsel to pay all attorneys' fees and costs expended by GES. Specifically, Judge Battisti found that defendants' failure to produce A7077, coupled with their destruction of its predecessors, prejudiced GES in the pursuit of its claims and that defendants had engaged in competition with GES in violation of the court's May 1991 injunction. Judge Battisti further concluded:
 
 
 31
 8. Defendants have repeatedly attempted to relitigate points of law decided against them. Defendants have continued to invoke Swiss law as a shield against discovery even though this position was rejected by the Court less than two months after the case was filed. Defendants have also attempted to relitigate the issue of confidentiality despite the Order of Confidentiality contained in the April Order. Finally, Defendants repeatedly have rejected to discovery on the grounds that Biosphere is not a party to this litigation despite the April Order finding that "Gysler, Strauss and Horsfall, in particular, as owners and employees of Biosphere, have no right to refuse to provide the information requested by Plaintiff."
 
 
 32
 141 F.R.D. at 451.
 
 
 33
 On May 29, 1992, in addition to entering a default judgment for GES in the amount of $11,861,658.17, Judge Battisti awarded GES attorneys' fees and costs totalling $268,284.64 ("May 29 order"). Judge Battisti arrived at the former figure by trebling GES's actual damages pursuant to RICO and then adding this sum ($3,953,886.39) to a punitive damages award of $7,907,772.78, which itself was determined by doubling GES's already-trebled actual damages. Defense counsel subsequently moved the court to alter or amend the judgment in an attempt to eliminate their liability under the May 29 order. Judge Battisti granted the motion on September 16, 1992.
 
 
 34
 Both parties appealed, defendants as to the sanctions entered against them and GES as to Judge Battisti's order granting defense counsel's motion to alter or amend the judgment. Before these appeals were argued to this court, however, Strauss filed a personal bankruptcy petition. GES then moved this court to stay the appeal as to all defendants, arguing that the stay that automatically applied to Strauss should be extended to all defendants because defendants' separate appeals were inextricably intertwined. This court, however, disagreed and granted GES's motion only as to Strauss.[10]
 
 II. DEFENDANTS' APPEAL
 A.
 
 35
 At the outset, we reject Gysler's and Biosys's contention that the instant action is not properly in federal court. In this regard, Gysler and Biosys maintain that Judge Battisti could not properly exercise jurisdiction over them because they are Swiss entities, and RICO, the court's only basis for federal question jurisdiction, does not provide for international service.[11] Nor does diversity jurisdiction exist, they add, because Horsfall is an Ohio resident.
 
 
 36
 Although we conclude that Gysler's and Biosys's argument is without merit, we do not quarrel with their interpretation of RICO's service-of-process provision. Instead, we note that Rule 4(i) of the Federal Rules of Civil Procedure and "the advisory committee's notes indicate that the authority for effecting foreign service can be found under federal or state law (of the state where the district court is located)." Gould, Inc. v. Mitsui Mining & Smelting Co., 750 F.Supp. 838, 841 (N.D.Ohio 1990); see also Brink's Mat, Ltd. v. Diamond, 906 F.2d 1519, 1522 (11th Cir.1990) ("Rule 4(e) permits a plaintiff to rely on either federal statutory authority or state law authority as to the amenability of a defendant to service of process, even if the state law authority extends beyond the express scope of the federal statutory authority.") (footnote omitted). "Therefore, foreign service for a RICO claim can be maintained when state law authorizes the foreign service."[12] Gould, 750 F.Supp. at 841.
 
 
 37
 Here, GES successfully contested below defendants' argument that their contacts with Ohio were insufficient to confer jurisdiction pursuant to Ohio's long-arm statute. See Ohio Rev.Code Sec. 2307.382. Moreover, Gysler and Biosys were served with GES's complaint by certified mail, as authorized by Rules 4.3 and 4.5 of the Ohio Rules of Civil Procedure. On appeal, Gysler and Biosys challenge neither their service of process under the Ohio Rules nor Judge Battisti's ruling under the state's long-arm statute. Their jurisdictional challenge must therefore fail.
 
 
 38
 Equally unavailing is Gysler's and Biosys's assertion that the forum selection clause contained within the parties' LLMO Agreement mandates that GES's claims be litigated in Switzerland. The clause at issue provides that:
 
 
 39
 This agreement shall be governed by the laws of Switzerland and the place of court is Rolle, Switzerland in case of claims from the PRINCIPAL. In case of claims by the DISTRIBUTOR, this Agreement shall be governed by the laws of the State of Ohio and the federal laws of the United States of America as applied by the United States Federal Courts in the State of Ohio.
 
 
 40
 (App. 82.) Gysler and Biosys now urge this court to rectify Judge Battisti's failure to give effect to this clause by dismissing GES's claims against them.
 
 
 41
 Specifically, Gysler and Biosys argue that, as a matter of sound policy, negotiated forum selection clauses not bearing indicia of fraud or coercion should be enforced. See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12 (1972) ("The choice of that forum was made in an arm's-length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts."). Although they acknowledge that GES's complaint does not ostensibly represent a direct action for breach of contract, Gysler and Biosys maintain that the forum selection clause should nevertheless apply because GES's claims are, at root, predicated on the LLMO Agreement. See Lambert v. Kysar, 983 F.2d 1110, 1121-22 (1st Cir.1993) ("The better general rule, we think, is that contract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties."); Rini Wine Co. v. Guild Wineries & Distilleries, 604 F.Supp. 1055, 1058-59 (N.D.Ohio 1985).
 
 
 42
 Were Gysler's and Biosys's characterization of GES's claims accurate, we might be inclined to adopt their argument. In our view, however, Gysler and Biosys have misconstrued the essence of GES's suit. It is not, as they posit, fundamentally a contract action with related, yet subsidiary claims; rather, it is one for which the LLMO Agreement (and its terms) are simply one relevant, but not dominant, component. Indeed, in its complaint, GES does not pursue even a single claim based on a breach of the LLMO Agreement, "but focuses instead on claims for racketeering, theft of trade secrets and interference with contract which occurred well before that contract was ever executed." (Appellee's Brief in Response to Appeals of Gysler and Biosys at 22.) As Judge Battisti held:
 
 
 43
 [GES] claims violations of the federal RICO statute, state statutes, and state common law. No contractual claims are made and no contract remedies sought. [GES] is entitled to try this case under its chosen theory. Accordingly, this court will not treat the instant action as arising out of the [LLMO Agreement]. Instead, it will be deemed to have arisen out of [GES's] ongoing business relationships with the Defendants. The [LLMO Agreement] is merely one of the final manifestations of those relationships, and as such, its terms cannot limit a comprehensive challenge to the Defendants' entire courses of conduct in this forum.
 
 
 44
 This suit is, therefore, broader than the forum selection clause.
 
 
 45
 General Envtl. Science Corp. v. Horsfall, 753 F.Supp. 664, 667-68 (N.D.Ohio 1990). We are not persuaded that this conclusion should be disturbed.
 
 B.
 
 46
 Next, we consider the propriety of the district court's action in ordering a default judgment in GES's favor. As this court has previously stated, under Rule 37:
 
 
 47
 A district court may sanction parties who fail to comply with discovery orders in a variety of ways, including dismissal of their lawsuit or entry of default judgment against them. "It is well-established ... that district court dismissal orders under this rule are reviewable only for abuse of discretion." Other circuits have recognized that this same standard of review applies to sanction decisions involving an entry of default judgment.
 
 
 48
 Simply put, "if a party has the ability to comply with a discovery order and does not, dismissal," and we add or entry of default, "is not an abuse of discretion." Just as " '[d]ismissal of an action for failure to cooperate in discovery is a sanction of last resort that may be imposed only if the court concludes that a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault,' " so, too, is entry of default judgment. Additional factors to consider in reviewing a district court's sanction decision under Fed.R.Civ.P. 37 include "whether the adversary was prejudiced by the dismissed [or defaulting] party's failure to cooperate in discovery, whether the dismissed [or defaulting] party was warned that failure to cooperate could lead to dismissal [or default], and whether less drastic sanctions were imposed or considered before dismissal [or default] was ordered."
 
 
 49
 Bank One of Cleveland, N.A. v. Abbe, 916 F.2d 1067, 1073 (6th Cir.1990) (citations and footnote omitted). Our analysis of this issue is further informed by the harsh nature of the sanction in dispute as well as our well-established preference for trials on the merits. In United Coin Meter Co. v. Seaboard Coastline Railroad, 705 F.2d 839, 845 (6th Cir.1983), we observed that "[j]udgment by default is a drastic step which should be resorted to only in the most extreme cases." In addition, we noted that "[t]rials on the merits are favored in federal courts and a 'glaring abuse' of discretion is not required for reversal of a court's refusal to relieve a party of the harsh sanction of default." Id. at 846; see also Regional Refuse Sys. v. Inland Reclamation Co., 842 F.2d 150, 154-55 (6th Cir.1988) (noting that this circuit has been less reluctant than others to reverse dismissals prompted by a party's failure to comply with discovery orders).
 
 
 50
 It is against this backdrop that we consider defendants' claim that Judge Battisti abused his discretion by entering the ultimate sanction of default judgment. It should be noted that, in advancing this argument, defendants have abandoned the strategy they pursued below of presenting a unified front. The approach they have adopted for their present purposes is perhaps most aptly described as "each man for himself." Not surprisingly, this new approach has led to a certain amount of finger pointing, as the respective defendants (Horsfall and Strauss, in particular) attempt to deflect blame for the alleged discovery abuses to their codefendants, if not GES.
 
 
 51
 We agree that, if blame is to be apportioned among defendants, they would not receive equal shares.[13] Indeed, it appears that among the various defendants Gysler[14] was most at fault. With respect to Horsfall, for instance, we note that, as a 17 percent shareholder who was neither an officer nor a director of Biosphere, he was incapable of complying with GES's discovery requests absent the concurrence of, most notably, Gysler. As such, a default judgment is inappropriate in his case because he did not have the ability to comply with GES's discovery requests. See Abbe, 916 F.2d at 1073. Indeed, our decision to vacate the judgment as to Horsfall would not change even assuming he did control the relevant documents, for his conduct during the discovery process was clearly not motivated by bad faith. See id. To the contrary, Horsfall appears to have offered the least discovery resistance of all defendants. Not only did he urge the production of A7077, but also he provided sensitive information about Biosphere in spite of Gysler's instructions. To the extent he impeded discovery, he did so, it seems, only out of a legitimate fear of retaliation from Gysler (not to mention Swiss authorities). And, although he admitted to discarding documents relevant to GES's claims, whether the documents in question were of a type that should have been preserved is far from settled.[15]
 
 
 52
 Of course, to resolve that Gysler is the most blameworthy defendant is not to conclude that a default judgment was appropriate in his case. To be sure, as an administrator for both Biosys and Biosphere, he not only had the ability to comply with GES's discovery requests, but also could effectively prevent company underlings (codefendants included) from doing so--a power that, as Horsfall can attest,[16] was not at all times merely latent. Moreover, we cannot countenance Gysler's obstinate reliance on the Swiss Penal Code Objection as a basis for resisting those requests, notwithstanding the vehemency with which he may have disagreed with Judge Battisti's ruling on the matter. The question remains, however, whether, all things considered, Gysler's conduct was so willful and egregious that it merits the imposition of the ultimate sanction. Because we feel that Gysler's conduct did not cross this threshold, we vacate the default judgment as to him as well.
 
 
 53
 Although we are thus mindful that Gysler, in particular, was not completely forthcoming during discovery, we note that a certain amount of resistance and wrangling during the discovery process is the norm rather than the exception, especially in international commercial litigation involving sophisticated litigants and high stakes. In short, whether Gysler's actions can be attributed to "willfulness, bad faith, or fault" we feel is too close a question to justify a default judgment. See United Coin, 705 F.2d at 846 (" 'Any doubt should be resolved in favor of the petition to set aside the judgment so that cases may be decided on their merits. Since the interests of justice are best served by a trial on the merits, only after a careful study of all relevant considerations should courts refuse to open default judgments.' ") (citations omitted). In reaching this conclusion, we pass no judgment on whether some sanction may have been in order; we hold only that the ultimate sanction was not.
 
 
 54
 The magnitude of Judge Battisti's damages award only compounds the inappropriateness of his action. See Amernational Indus., Inc. v. Action-Tungsram, Inc., 925 F.2d 970, 978 (6th Cir.) ("Our conclusion [to vacate the default judgment] is further strengthened by the sheer size [approximately $11 million] of the damage award in this case."), cert. denied, 111 S.Ct. 2857 (1991); Hester Int'l Corp. v. Federal Republic of Nigeria, 879 F.2d 170, 175 (5th Cir.1989) ("We have recognized previously that if the amount of money involved [in the judgment] is very great the amount militates in favor of granting a full trial on the merits."). Stated simply, awarding a default judgment for nearly $12 million on an action that GES, itself, originally valued at a fraction of that sum constitutes an excessively harsh, even draconian penalty under the facts presented.[17] By setting aside the court's judgment, however, we do not mean to approve of any of the machinations undertaken to this point in the proceedings. In fact, we admonish the parties that further discovery abuses will be judged not on a clean slate, but in light of all prior abuses that already have occurred. Our decision to vacate, therefore, should not preclude the district court from considering whether lesser sanctions still should be imposed, or from reconsidering, in the event of subsequent abuses, whether a default judgment may yet be warranted.
 
 
 55
 We also set aside Judge Battisti's award of attorneys' fees against defendants. In this regard, we express skepticism as to whether the judge would have ordered this sanction without having entered a default judgment; if, as we suspect, he would not have done so, our decision to vacate the latter necessarily nullifies the former. Even assuming, however, that the award of attorneys' fees constitutes an independent sanction (i.e., one that is not affected by our ruling on the default judgment), it still could not be sustained. As the Fifth Circuit has explained, under Rule 37(b)(2)(E), "a party may be personally liable for reasonable expenses including attorney's fees caused by the failure to comply with a discovery order." Batson v. Neal Spelce Assocs., Inc., 765 F.2d 511, 516 (5th Cir.1985) (citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 763 (1980)); see also Toth v. Trans World Airlines, Inc., 862 F.2d 1381, 1386 (9th Cir.1988) ("Because the costs and fees awarded were not properly segregated to those expenses caused by the failure to obey court orders, as circumscribed by 37(b)(2) and the district court's sanction order, we remand to the district court with directions to adjust the award of monetary sanctions accordingly.").
 
 
 56
 Here, the district judge justified the award of attorneys' fees in the following manner:
 
 
 57
 GES and its counsel have itemized [GES's] expenses and attorney fees. Their rates are reasonable for the level of skill and experience of Plaintiff's counsel and considering complex issues raised by RICO and several issues of foreign law raised by the Defendants. Accordingly, $268,284.64 in fees and costs are assessed jointly and severally against Defendants and their counsel....
 
 
 58
 800 F.Supp. at 1506. As such, the judge made no effort to discern the fees and expenses GES incurred solely as a result of defendants' and defense counsel's obstructive practices. See Toth, 862 F.2d at 1386 ("On remand, the district court is instructed to set forth facts explaining its ultimate award."); Batson, 765 F.2d at 517 ("[T]he court must articulate reasons for its assessment so that, if appealed, we may have a basis to review the court's action."). Absent such a determination, the attorneys' fees award cannot be sustained.
 
 
 59
 We thus vacate the default judgment as well as the award of attorneys' fees against defendants and remand with the following instructions. First, we instruct that the case be removed from Judge Battisti's docket and assigned to a different district judge. While we do not share defendants' view that either Judge Battisti, by seeking reassignment to this case after disqualifying himself, or Judge Lambros, by granting the request, necessarily violated 28 U.S.C. Sec. 455(a)[18] and Rule 7.09(1) of Local Rules for the Northern District of Ohio,[19] we do feel that, given the history of this litigation, the more appropriate course is to have a judge other than Judge Battisti assume control over the case from this point forward. In addition, we leave to the district court on remand the task of evaluating the appropriateness of the injunctive relief afforded GES by Judge Battisti.
 
 III. GES'S CROSS-APPEAL
 
 60
 The following paragraphs of Judge Battisti's March 10, 1992, order explain his initial decision to sanction defense counsel with attorneys' fees and expenses:[20]
 
 
 61
 34. Counsel for Defendants are just as culpable [as defendants themselves]. They too have displayed a willingness to frustrate and obstruct court orders.
 
 
 62
 35. Counsel continued to rely on Swiss discovery procedures to object to deposition questions, interrogatories and document requests, despite the September Order rejecting the applicability of Swiss discovery procedures to this case. Counsel's persistence in resisting discovery on the basis of Defendants' immunity under Swiss law delayed the production of documents and gave Defendants the opportunity to destroy documents.
 
 
 63
 36. Counsel advised their clients that the May Order was not applicable to Defendants' competition with GES so long as Defendants compete behind the mask of Biosphere, a point never refuted by counsel despite the opportunity. Since Defendants are virtually the sole officers, shareholders and employees of Biosphere, counsel's advice is highly contemptuous of this Court's rulings and perpetuates the Defendants' efforts to avoid liability through shell corporations.
 
 
 64
 37. Additionally, in filing Document A7077 under seal and withholding it from Plaintiff, defense counsel represented that the trade secrets issue could be decided on the basis of the contents of Document A7077. At the hearing on November 26, 1991, defense counsel attempted to minimize the significance of Document A7077 and its predecessors. The willingness of defense counsel to manipulate and fabricate facts to sustain whatever their current position might be is evidence of their bad faith.
 
 
 65
 38. Defense counsel's behavior even after the November 26, 1991 hearing demonstrates bad faith. Although counsel was in receipt of the alleged predecessors to Document A7077 on December 2, 1991 defense counsel did not make those documents available to Plaintiff or advise Plaintiff of the existence of such documents until 5:43 P.M. on Friday, December 6, 1991. Furthermore, defense counsel did not advise Plaintiff's counsel of the nature of such documents.
 
 
 66
 39. Counsel's assistance in obstructing discovery is particularly offensive given the fact that defense counsel represented Defendants and reviewed the documents whereby Biosys terminated its contract with GES in May 1990. Had defense counsel just been retained for this lawsuit their claims of good faith might have had more credence. However, because defense counsel were involved at the outset of the alleged scheme, well before the complaint was ever filed, they had every opportunity to assure timely discovery and the preservation of records. Instead, defense counsel has, at every opportunity, resorted to whatever tactic is accommodative to delay this case, including attempts to trivialize Defendants' destruction of discoverable records.
 
 
 67
 40. Defense counsel's principal response to questions about Defendants' failure to provide discovery has been to claim that Plaintiff has no case on the merits. Counsel should be well aware that perceived weaknesses in an opponent's case are no justification for repeated violations of court orders.
 
 
 68
 141 F.R.D. at 455-56.
 
 
 69
 Soon after Judge Battisti entered his order, defense counsel, comprised of Stephen Walters, Jason C. Blackford, and Thomas C. Buford, moved to alter or amend the judgment. Accompanying their motion were several affidavits that purported to refute several of the findings made by Judge Battisti, particularly those listed in paragraphs 35-39 of his March 10 order. For instance, an affidavit of Blackford taken June 4, 1992, was offered to demonstrate that defense counsel did not, in fact, continue to rely on the Swiss Penal Code Objection after the court's September 14 order (paragraph 35). A separate Blackford affidavit, dated June 26, 1992, also disputed the judge's finding that defense counsel had advised their clients that they could continue to compete with GES, despite the judge's express holdings indicating otherwise (paragraph 36). As to the judge's conclusion regarding defense counsel's handling of A7077 and its predecessors, additional affidavits asserted that defendants, not their counsel, were primarily responsible for the obstruction of the discovery process that occurred (paragraphs 37 and 38).
 
 
 70
 Despite having chastised defense counsel for their conduct, Judge Battisti nevertheless granted their motion. In doing so, however, he did not exactly heap praise on defense counsel:
 
 
 71
 While the "factual" representations and arguments of law made by or on behalf of the attorneys leave much to be desired, the Court has reconsidered its decision to hold them jointly liable for all of Plaintiff's attorneys fees. As egregious and sanctionable as their conduct was, the Court nonetheless, on reconsideration of the exercise of its discretion, has decided to vacate the part of its March 10, 1992 Order holding them jointly and severally liable for all of Plaintiff's attorney fees. Defendants, the principal culprits, remain liable for Plaintiff's damages and attorneys fees.
 
 
 72
 (App. 2660-61.)
 
 
 73
 GES now contends that Judge Battisti erred by retracting his previous decision to sanction defense counsel. Rule 37 states that, if a party fails to obey a discovery order, "the court in which the action is pending may make such orders in regard to the failure as are just." Fed.R.Civ.P. 37(b)(2); see also Metrocorps, Inc. v. Eastern Massachusetts Junior Drum & Bugle Corps Ass'n, 912 F.2d 1, 2 (1st Cir.1990). Rule 37 also provides that:
 
 
 74
 In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.
 
 
 75
 Fed.R.Civ.P. 37(d). The notes on the rule add that:
 
 
 76
 Subdivision (b)(2) is amplified to provide for payment of reasonable expenses caused by the failure to obey the order.... The provision places the burden on the disobedient party to avoid expenses by showing that his failure is justified or that special circumstances make an award of expenses unjust. Allocating the burden in this way conforms to the changed provisions as to expenses in Rule 37(a), and is particularly appropriate when a court order is disobeyed.
 
 
 77
 Fed.R.Civ.P. 37(b)(2) advisory committee's note (citations omitted).
 
 
 78
 GES argues that, under Rule 37, Judge Battisti effectively had no choice but to sanction defense counsel; his ultimate failure to do so, it is urged, constitutes an abuse of discretion. As GES observes, to find support for its argument this court need look no further than Judge Battisti's order granting defense counsel's motion to amend the judgment; after all, the judge granted the requested relief while simultaneously characterizing defense counsel's conduct as "egregious and sanctionable." Judge Battisti's doublespeak aside, GES asserts that there are other reasons justifying the imposition of sanctions against defense counsel. Not only did defense counsel withhold A7077 from GES until it became clear that their reliance on Swiss law was indefensible, but also they "deliberately chose to present no defense to the motion for sanctions as a litigation strategy." (Cross-Appellant's Brief at 42.) Sanctioning defense counsel, according to GES, would also promote the venerable goals of enhancing the public's perception of attorneys and judges and deterring other litigants from similarly abusing the discovery process.
 
 
 79
 Perhaps GES's arguments would be determinative were we merely reviewing Judge Battisti's initial decision to award sanctions. GES's task is not so easy, however, where, as here, it must persuade the court that an abuse of discretion has occurred. Indeed, in view of the affidavits submitted by defense counsel, we cannot conclude that this is an occasion in which a reversal of Judge Battisti's decision not to sanction is in order. Even if we were to subscribe to GES's view that Judge Battisti rejected defense counsel's post-judgment evidence, the question would still remain whether, at the time he issued his judgment, Judge Battisti could have justifiably reached the opposite conclusion.[21] We feel that he could have, and accordingly, we reject GES's argument founded on Rule 37.
 
 
 80
 GES also contends that Rule 59(e) establishes a separate basis for reversing the court's decision not to sanction defense counsel. Rule 59(e) provides that "[a] motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment." At issue here is not whether defense counsel filed their motion in a timely manner, but instead, whether Rule 59(e) is an appropriate vehicle through which to secure the relief sought. GES argues that defense counsel could not properly invoke the rule in this instance because they failed to offer their arguments and evidence prior to judgment.[22] Defense counsel's belief that they would have compromised their clients' position by mounting a defense of their own is, for GES, unavailing. GES cites case law and various ethical rules to support its claim that defense counsel should have responded to the accusations against them from the outset, instead of waiting until the judgment already had been rendered.
 
 
 81
 Although we agree in the abstract that counsel may not first encourage their clients to obstruct discovery and then use those clients to shield themselves from discovery sanctions, we do not feel that this scenario accurately depicts what occurred in this particular case. Here, defense counsel obtained GES's supplemental memorandum in support of its renewed motion for sanctions only one day before the hearing on the motion was to take place. This memorandum alleged that defendants had destroyed documents and that defense counsel had, themselves, either condoned or participated in obstructive discovery tactics. Thus, both practical--i.e., the need to respond expeditiously--and ethical-- i.e., the duty to zealously represent their clients--considerations factored into defense counsel's decision not to pursue their defense at that time. Viewed from this perspective, defense counsel did not act improperly by opting to focus, at least initially, on the arguments supporting their clients' position. We therefore reject GES's assertion that, pursuant to Rule 59(e), Judge Battisti abused his discretion by reconsidering his earlier decision to sanction defense counsel.[23] See Healey v. Chelsea Resources, Ltd., 947 F.2d 611, 623 (2d Cir.1991) ("A potential for conflict is inherent in a sanctions motion that is directed against both a client and a lawyer....") (citing In re Ruben, 825 F.2d 977, 985 (6th Cir.1987), cert. denied, 485 U.S. 934 (1988)).
 
 
 82
 We VACATE the default judgment and REMAND for proceedings consistent with this opinion. As to plaintiff's cross-appeal, we AFFIRM the denial of sanctions.
 
 
 
 [1]
 Strauss, however, sold his interest (58%) to his father-in-law sometime in November 1989
 
 
 [2]
 Horsfall and Strauss, then, were privy to much sensitive and confidential company information. At GES's insistence, Horsfall and Strauss had each signed contracts requiring that they preserve trade secrets and not compete with GES
 
 
 [3]
 Gysler and Biosys provide a different account of the ostensible purpose behind the formation of Biosphere. They maintain that, due to the problems they were experiencing with the quality of GES's goods, "[t]he reputation and credibility of Biosys and its representatives in Europe among European customers began to take a beating." (Appellants Gysler's and Biosys's Brief at 12.) They had hoped that Biosphere would thus provide a "means to continue satisfying the customers in Europe despite mounting liability potential to them." (Id.)
 
 
 [4]
 The affidavit of Karl F. Ehrlich, taken July 25, 1990, provided support for GES's claims. According to Ehrlich, a GES customer,
 [b]etween August 1989 and December 1989, [Horsfall and Strauss] would call me (Strauss would sometimes call 3 to 4 times a week) to acquire information about aquaculture and aquarium applications and to complain about GES products and management. They also indicated that they [Biosys] were entering a contract for distribution with GES that they never intended to honor, and that they planned in the future to break this contract as soon as they could set up their own production facilities and that they would use product variability and potency as a basis for breaking the contract and competing.
 (App. 298.)
 
 
 [5]
 Although all defendants eventually answered GES's first set of interrogatories, only Horsfall and Strauss did so within the expedited time frame established by the district court
 
 
 [6]
 Defendants maintain that because defense counsel received Judge Battisti's April 4 order on April 8, they actually had only 16, not 20, days to comply with its terms. Horsfall adds that he was in Europe at the time, and thus was not informed of the judge's ruling until mid-April
 
 
 [7]
 Defendants evidently were more forthcoming during this second round of depositions. Horsfall, for one, claims that he answered all questions asked of him without once asserting an objection based on Swiss law. Strauss, too, maintains that the so-called Swiss Penal Code Objection was a nonfactor in his deposition and that, to the extent he declined to answer some questions, he did so only on attorney-client privilege grounds
 While at least some of the defendants may thus have been more amenable, according to GES, the same cannot be said for defense counsel Stephen Walters. Not only was Walters, in GES's estimation, blatantly disdainful of the district judge and plaintiff's counsel, but also he denied the existence of various court orders. Moreover, GES alleges that defense counsel advised defendants that, through Biosphere, they could continue to compete with GES despite the court's May 24 order.
 
 
 [8]
 Horsfall hastens to note that he not only favored the release of A7077 for GES's review, but also answered (to the extent his memory permitted) questions regarding the document during deposition
 
 
 [9]
 Indeed, as the district court would eventually find:
 Defendants admit that predecessor documents to Document A7077 existed. The first such document was created in October 1990. Six successor documents were created and additions, deletions and modifications were made to the "working document" from time to time. These documents would purportedly trace the development of Defendants' products from the date they terminated their contract with GES. Horsfall admits destroying the predecessor documents to Document A7077. According to Horsfall, the destruction continued from October 1990 to April or May 1991.
 
 
 [141]
 F.R.D. at 448 (citations omitted)
 
 
 [10]
 Although Strauss therefore is not technically a party before this court, our decision is, for obvious reasons, relevant to his bankruptcy proceeding. We leave to him the decision of what to do to avail himself of this decision in the bankruptcy court
 
 
 [11]
 The relevant RICO provision states: "All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. Sec. 1965(d)
 
 
 [12]
 The view enunciated in Gould, however, is not shared by all courts. See generally Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L., 817 F.Supp. 326, 331-32 (E.D.N.Y.1993) (discussing disagreement among courts considering the issue). Some courts adhere to the notion that a "RICO action cannot be brought against persons who remain beyond this country's borders because such persons cannot be served." Id. at 332. The Biofeedtrac court set forth its reasons for not following these courts, reasons that we find persuasive:
 First, Rule 4(e) makes plain that parties may serve a summons as provided either by a federal statute or by the forum state's jurisdictional statute. Absent a plain statement in the RICO statute that persons outside the United States may not be served with process, this court will not ignore the second sentence in Rule 4(e).
 Second, Congress hardly would have immunized from RICO liability the foreign-based co-conspirators of a racketeering enterprise that conducts its activities here and that injures persons here. Nor would Congress have immunized one who engages in a continuous and systematic pattern of racketeering activity and who then retreats to an off-shore haven hoping to avoid service of process. This court will not construe Congressional silence with respect to extraterritorial service as a Congressional grant of immunity from such service.
 This court instead agrees with those courts that have concluded that even though the RICO statute does not provide for extraterritorial service upon persons outside the United States, plaintiff may look to the laws of the state in which the district court sits.
 Id.
 
 
 [13]
 In this regard, we are mindful of Horsfall's contention that Judge Battisti should not have treated defendants monolithically. According to Horsfall, a more careful parsing of the record reveals that he did not, unlike Gysler, engage in the discovery abuses that are alleged to have occurred. For instance, Horsfall notes that he answered GES's complaint as well as the interrogatories addressed to him in a timely manner; subjected himself to eight days of depositions; produced approximately 7,000 pages of documents; and even argued for the release of A7077 to GES--a suggestion that Gysler and defense counsel rejected
 
 
 [14]
 Gysler and Biosys joined in filing an appellate brief. For purposes of this opinion, our determinations regarding Gysler's conduct apply with equal force to the corporate defendant Biosys
 
 
 [15]
 Although Strauss, as noted above, is not a party to this appeal, our review of the record indicates that he, too, was not a principal culprit--at least vis-a-vis Gysler. Granted, as GES submits, Strauss may have had access to the documents requested by GES; whether he was in a position to command their production, however, is another matter. See Estate of Young v. Holmes, 134 F.R.D. 291, 294 (D.Nev.1991) ("The relationship between the party and the person or entity having actual possession of the document is central in each case. The party must be able to command release of the documents by the person or entity in actual possession."); see also United States v. International Union of Petroleum and Indus. Workers, 870 F.2d 1450, 1452 (9th Cir.1989) ("Control is defined as the legal right to obtain documents upon demand.") (citing Searock v. Stripling, 736 F.2d 650, 653 (11th Cir.1984))
 
 
 [16]
 In his brief, Horsfall contends that Gysler and Dudley Wright, another Biosphere administrator, ordered him not to divulge information relating to Biosphere. In a letter dated August 8, 1990, Gysler informed Horsfall of the consequences of not keeping quiet:
 We wish to remind you that as an employee of our Company, you are held to secrecy and confidentiality according to Swiss law and that the Swiss Penal Code art. 273 CPS provides criminal penalties for violating its provisions.
 We trust that you will respect your obligations and we will not hesitate to take legal action against you or any third party in case confidential information is divulged.
 (Appellant Horsfall's Brief at 29.)
 
 
 [17]
 In its complaint, GES prayed for pre-trebled "[a]ctual damages of at least $41,214.50 and such further damages as the evidence may show[.]" (App. 59.) GES did, however, seek punitive damages in excess of $10 million
 
 
 [18]
 This provision states: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."
 
 
 [19]
 This rule requires that a disqualified judge be replaced with one chosen by random lot
 
 
 [20]
 Judge Battisti cited two separate sources of authority for this action: Rule 37 and the Supreme Court's decision in Chambers v. NASCO, Inc., 111 S.Ct. 2123 (1991) (discussing inherent power of the court to punish bad faith abuse of process)
 
 
 [21]
 By the same token--without suggesting that Judge Battisti's characterization of defense counsel's conduct is accurate--to determine that conduct is "sanctionable" is not to definitively resolve that sanctions must necessarily follow. To take the final step of actually imposing sanctions requires the exercise of discretion, only the abuse of which will cause this court to set aside the lower court's ruling
 
 
 [22]
 Defense counsel's initial response to GES, contained in their supplemental memorandum filed with the district court on the morning of the hearing on GES's renewed motion for sanctions, was as follows:
 Plaintiff in its Supplemental Memorandum hurls invective and insult against the Defendants (e.g.--"plotting with Swiss counsel" p. 14; "fleeing to Switzerland" p. 12). Beyond the jingoistic notion permeating the Supplemental Memorandum that "Swiss"--"criminal", Plaintiff also attempts to drive a wedge between the Defendants and their counsel.
 The Court will note that there is absolutely no evidence offered by Plaintiff of wrong-doing or impropriety on the part of defense counsel. If Plaintiff purports to have such evidence, let it come forward now or forever stop this slander.
 (App. 1717.)
 
 
 [23]
 Here, we reiterate our point that Judge Battisti failed to determine the amount of GES's attorneys' fees and costs directly attributable to defendants' and defense counsel's failure to obey court orders. Thus, even if we were to conclude that the trial judge erred by ultimately deciding against sanctioning defense counsel, we still would be compelled to vacate his attorneys' fees award